**CONTINENTAL OIL COMPANY, Austral Oil Company, Incorporated, Bright and Schiff, Blanco Oil Company and Killian and Hurd, Shell Oil Company, Petitioners,**

v.

**FEDERAL POWER COMMISSION, Respondent,**

**The Brooklyn Union Gas Company, Long Island Lighting Company, Philadelphia Gas Works, Division of the United Gas Improvement Company, Intervenors.**

**The BROOKLYN UNION GAS COMPANY, Long Island Lighting Company, Philadelphia Gas Works, Division of the United Gas Improvement Company, Public Service Commission of the State of New York, Petitioners,**

v.

**FEDERAL POWER COMMISSION, Respondent,**

**Texaco, Inc., Gulf Oil Corporation, Inc., Humble Oil Company, Inc., Austral Oil Company, Inc., McCurdy and McCurdy, Sun Oil Company, Pan American Petroleum Corp., Jonnell Gas, Inc., Bright and Schiff, Shell Oil Company, Intervenors.**

**Margaret Hunt HILL, Trustee for Hassie Hunt Trust, H. L. Hunt, Hunt Oil Company, Lamar Hunt, Trustee for William Herbert Hunt Trust Estate, A. G. Hill, Trustee for Lamar Hunt Trust Estate, George W. Graham, Inc., Placid Oil Company, Petitioners,**

v.

**FEDERAL POWER COMMISSION, Respondent.**

**HUNT OIL COMPANY, Lamar Hunt, Trustee for William Herbert Hunt Trust Estate, A. G. Hill, Trustee for Lamar Hunt Trust Estate, Placid Oil Company, Petitioners,**

v.

**FEDERAL POWER COMMISSION, Respondent.**

Nos. 23188, 23189, 23325, 23333, 23408, 23454, 23455, 21286, 21575, 21856.

United States Court of Appeals
Fifth Circuit.

May 24, 1967.

No. 23188:

Thomas H. Burton, Joseph C. Johnson, Bruce R. Merrill, Houston, Tex., Francis H. Caskin, Washington, D. C., for petitioners.

No. 23189:

W. H. Drushel, Jr., J. Evans Attwell, Houston, Tex., for petitioners.

No. 23333:

George B. Mickum, III, Washington, D. C., for petitioners.

No. 23408:

Thomas G. Johnson, New York City, for petitioners.

No. 23454:

Edwin F. Russell, Harry G. Hill, Jr., Barbara M. Suchow, Brooklyn, N. Y., William T. Coleman, Jr., Robert W. Maris, Philadelphia, Pa., Edward M. Barrett, Bertram D. Moll, Mineola, N. Y., Morton L. Simons, Washington, D. C., for petitioners.

No. 23455:

Kent H. Brown, Albany, N. Y., Barbara M. Suchow, Brooklyn, N. Y., for petitioners.

Nos. 21286 and 21575:

Richard F. Generelly, Washington, D. C., Thomas G. Crouch, Robert W. Henderson, Paul W. Hicks, Dallas, Tex., for petitioners.

No. 21856:

Paul W. Hicks, Thomas G. Crouch, Dallas, Tex., for petitioners.

Howard E. Wahrenbrock, Sol., FPC, Richard A. Solomon, Gen. Counsel, FPC, Paul A. Sweeney, Atty., for FPC in Nos. 21286, 21575 and 21856.

Robert A. Jablon, Atty., for FPC in Nos. 23188, 23189, 23325, 23333, 23408, 23454 and 23455.

Nos. 23188, 23189, 23333, and 23408:

Edwin F. Russell, Harry G. Hill, Jr., Barbara M. Suchow, Brooklyn, N. Y., William T. Coleman, Jr., Robert W. Maris, Philadelphia, Pa., Edward M. Barrett, Bertram D. Moll, Mineola, N. Y., Morton L. Simons, Washington, D. C., Martin N. Erck, Houston, Tex., for intervenors.

Nos. 23454 and 23455:

W. H. Drushel, Jr., J. Evans Attwell, Houston, Tex., Robert B. Payne, Thomas G. Crouch, Dallas, Tex., Richard F. Generelly, Robert E. May, Washington, D. C., Phillip D. Endom, Philadelphia, Pa., Philip R. Ehrenkranz, Carroll L. Gilliam, Washington, D. C., J. P. Hammond, Clifford O. Stone, Jr., Tulsa, Okl., Dean J. Capp, Houston, Tex., Warren M. Sparks, Donald R. Arnett, Tulsa, Okl., Carl Illig, Houston, Tex., Jesse H. Foster, Houston, Tex., James K. Schooler, Houston, Tex., William R. Slye, Houston, Tex., Leo J. Hoffman, Dallas, Tex., for intervenors.

Oliver Stone, New York City, for intervenor only in No. 23454.

Thomas G. Johnson, New York City, for intervenor only in No. 23454.

Before BROWN, BELL and DYER, Circuit Judges.

DYER, Circuit Judge:

Three groups of cases raise in a variety of ways the validity of the Federal Power Commission's "in-line" price pronouncement, its statement of general policy, moratorium ceilings, and refund requirements.

In the first group the producer petitioners [1] pursuant to § 19(b) of the Natural Gas Act,[2] challenge an order of the FPC of September 30, 1965, in a consolidated proceeding entitled Turnbull & Zock Drilling Co. (operator) et al., Opinion No. 478, granting permanent certificates of public convenience and necessity under § 7(c) and (e) of the Act to sixty seven producers to undertake new sales of natural gas from Texas Railroad Commission District No. 4 [3] to interstate pipelines contracted between 1956 and 1964.

The producers had proposed initial prices for their sales ranging from 14.5¢ to 20.045¢ per Mcf.[4] The FPC applying its previously announced in-line price schedule issued its permanent certificates conditioning them so that the initial price for the sales contracted prior to September 28, 1960, should not exceed 15¢, and for those after that date 16¢. A temporary restriction (moratorium) was placed on the filing of increased rates above 18¢ until the issuance of a decision in the Area Rate Proceeding,[5] covering District 4, or January 1, 1968, whichever is earlier.

The producer-petitioners [6] variously object that the initial prices are too low, that exceptions from generally prescribed in-line initial price should have been allowed for some sales, and that the moratorium on increases over 18¢ was erroneously imposed. The second group, eastern seaboard distributor-petitioners [7] object principally that the 16¢ initial price for contracts executed after September 28, 1960, was too high. They, as well as some of the producer-petitioners also object to the action of the Commission in deferring the question of whether or not refunds of amounts collected by the producer-petitioners in excess of the in-line prices should be required.

1. Nos. 23188, 23189, 23325, 23333 and 23408. Upon motion of petitioner Bright & Schiff in No. 23325 leave was granted to withdraw its petition for review and the proceeding was dismissed on June 21, 1966.

2. The Natural Gas Act was approved June 21, 1938, 52 Stat. 821–833, and thereafter amended from time to time, 15 U.S.C.A. §§ 717–717w. Section 19(b) was amended 72 Stat. 941, 947; 15 U.S.C.A. § 717r.

3. An area of 15 counties in Southern Texas.

4. All but one of the sales had been temporarily authorized under § 7(c) of the Act and § 157.28 of the Commission's regulations (18 C.F.R. 157.28). These certificates were issued *ex parte*, by letter orders, upon the producers' sworn statements asserting a variety of emergency conditions, which, they claimed, required immediate authorization to commence the sales in question.

5. Texas Gulf Coast Area Rate Proceeding. Docket AR64–2.

6. See note 1 supra.

7. Nos. 23454 and 23455.

The Distributors [8] intervened in partial support of the Commission's order in some of the Producers' cases.[9] Producer-petitioner Austral Oil Co., Inc.[10] intervened in partial support of the Commission's order in the Distributor cases.[11]

The third group comprises the three Hunt petitioners.[12]

In 21286 petitioner [13] had negotiated gas purchase contracts in 1959 with interstate pipeline companies for sales for a twenty year period from reserves in Texas Railroad Commission Districts 2, 3 and 4 at an initial contract price of 20¢ per Mcf. By order of December 9, 1963, Opinion 412, the FPC issued permanent certificates conditioned so that the initial price should not exceed 15¢ for sales in Districts 2 and 4 and 16¢ in District 3; and that petitioners refund with 7% interest the difference between the contract rates and the initial prices determined by the Commission paid by the pipeline purchaser subsequent to November 2, 1961.

In No. 21575 [14] by order of February 24, 1964, opinion 412A granting permanent certificates, the FPC proscribed the filing of any price increase in excess of 19¢ in District 3 and in excess of 18¢ in Districts 2 and 4 until a final decision was issued by the Commission in the Area Rate Proceeding covering these districts, or until January 1, 1968, whichever is earlier.

In 21856 the producer-petitioners [15] whose sales were in Districts 2 and 4 filed notices of change,[16] reducing the price from 18¢ (which they were collecting under the temporary certificates) to 15¢ (the reduced price under Opinion 412) with an immediate increase to 18¢ (the moratorium level established in Opinion 412A). Similar action was taken as to sales in District 3. The 20¢ contract price was reduced to 16¢, the "in-line" price, and immediately increased to 19¢, the price moratorium level.

The FPC rejected the attempted change for Districts 2 and 4 and accepted for filing the change for District 3, then suspended it. The latter change ultimately was permitted to go into effect subject to refund.

The Hunt petitioners [17] assert that the in-line prices are too low, that they were denied administrative due process, that 7% interest ordered to be paid on refunds is exorbitant, that the price moratorium was unreasonable, and that the price increase was improperly rejected.

All of the causes were set for oral argument at the same time because, although there are several peripheral questions involved, there is an identity of principal issues. The causes are likewise treated here.

### "In-Line" in § 7 Applications

The nature and scope of the FPC's duty to review producer price proposals before permitting natural gas to enter the interstate market has been so thoroughly litigated in the past few years that it might be thought that the picture to be drawn from the decided cases could be painted with a light brush. Unfortunately this is not so. Not the least

8. See note 7 supra.

9. Nos. 23188, 23189, 23325 and 23408.

10. It is joined by other grantees of certificates issued by the order, McCurdy and McCurdy, Sun Oil Co., Pan American Petroleum Corp., Gulf Oil Corp., Humble Oil & Refining Co., Jonnell Gas, Inc. and Texaco, Inc.

11. See note 7 supra.

12. Nos. 21286, 21575 and 21856.

13. Margaret Hunt Hill, Trustee for Hassie Hunt Trust, H. L. Hunt, Hunt Oil Company, Lamar Hunt, Trustee for William Herbert Hunt Trust Estate, A. G. Hill, Trustee for Lamar Hunt Trust Estate, George W. Graham, Inc., and Placid Oil Company.

14. See note 13 supra.

15. Hunt Oil Company, Lamar Hunt, Trustee for William Herbert Hunt Trust Estate, A. G. Hill, Trustee for Lamar Hunt Trust Estate and Placid Oil Company.

16. The attempted change in rates was sought to be accomplished pursuant to § 4(e) of the Natural Gas Act, 15 U.S.C.A. § 717c(e).

17. See notes 12, 13 and 15 supra.

of the problems being the continuous flow of new opinions from our sister courts, five of which have come out since submission of this case, and requiring a choice among several conflicting holdings.[18]

When in 1954 it was held in *Phillips I* [19] that the FPC had the statutory responsibility for regulating interstate sales by natural gas producers, the FPC was faced with two major problems. The first was to determine the just and reasonable rates under Sections 4 and 5 of the Natural Gas Act [20] for producer sales in interstate commerce. The second was to develop a standard which would permit new sales to be made under pricing arrangements that would protect all interests pending determination of just and reasonable rates.

The Supreme Court made clear in *Catco* [21] that in cases under § 7 of the Act,[22] it is the responsibility of the FPC to make certain that the consumer is protected against excess charges between the time the gas first enters the interstate market and the time—many years later —that a rate investigation is concluded and a just and reasonable rate is fixed by final order. This is accomplished by the imposition of a rate condition in the grant of an initial certificate, either temporary or permanent, whenever an initial price is not in keeping with the public interest because it is "out of line".[23]

Following *Catco* and the Third Circuit's *Transco-Seaboard* decision [24] a number of circuits wrote on the in-line price concept.[25]

18. Sunray DX Oil Company et al. v. FPC, 10 Cir. (1966), 370 F.2d 181; Skelly Oil Company et al. v. FPC, 10 Cir. (1967), 375 F.2d 6; Public Service Commission of State of New York et al. v. FPC, D.C.Cir. (1967), 373 F.2d 816; Pan American Petroleum Corporation et al. v. FPC, 10 Cir. (1967), 376 F.2d 161; Standard Oil Company of Texas et al. v. PFC, 10 Cir. (1967), 376 F.2d 578. Petitions for certiorari have been filed in all of these cases.

19. Phillips Petroleum Co. v. State of Wisconsin et al., 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035.

20. 15 U.S.C.A. §§ 717c and 717d.

21. Atlantic Refining Co. et al. v. Public Service Commission of State of New York, 360 U.S. 378, 79 S.Ct. 1246, 3 L. Ed.2d 1312.

22. 15 U.S.C.A. § 717f.

23. In *Catco* the court said "[w]here the proposed price is not in keeping with the public interest because it is out of line or because its approval might result in the triggering of general price rises or increase in the applicant's existing rates by reason of 'favored nation' clauses or otherwise, the Commission in the exercise of its discretion might attach such conditions as it believes necessary." (360 U.S. 378 at 391, 79 S.Ct. 1246 at 1255)

24. United Gas Improvement Co. v. Public Service Comm. of State of New York, 3 Cir. 1959, 269 F.2d 865 (subsequently va-

cated sub nom. P.S.C. of New York v. F.P.C. (1959), 361 U.S. 195, 80 S.Ct. 292, 4 L.Ed.2d 237).

25. California Co., 22 FPC 252, rehearing denied, 22 FPC 653, set aside sub nom. U.G.I. v. F.P.C., 9 Cir., 283 F.2d 817, cert. den. sub nom. Superior Oil Co. v. U.G.I., 365 U.S. 879, 81 S.Ct. 1030, 6 L. Ed.2d 191 and California Co. v. U.G.I., 365 U.S. 881, 81 S.Ct. 1030, 6 L.Ed. 2d 192; Sun Oil Co., 22 FPC 351, rehearing denied, 22 FPC 654, set aside sub nom. U.G.I. v. FPC, 5 Cir., 290 F.2d 133, cert. den. sub nom. Sun Oil Co. v. U.G.I., 368 U.S. 823, 82 S.Ct. 41, 7 L.Ed.2d 27; Sunray Mid-Continent Oil Co., 22 FPC 361, rehearing denied, 22 FPC 652, set aside sub nom. U.G.I. v. F.P.C., 10 Cir., 287 F.2d 159; Superior Oil Co., 22 FPC 369, rehearing denied, 22 FPC 655, set aside sub nom. U.G.I. v. F.P.C., 5 Cir., 290 F.2d 147, cert. den. sub nom. Superior Oil Co. v. U.G.I., 366 U.S. 965, 81 S.Ct. 1926, 6 L.Ed.2d 1255; Texas Gas Transmission Corp., 22 FPC 378, rehearing denied, 22 FPC 657, set aside sub nom. P.S.C. of State of New York v. F.P.C., 109 U.S.App.D.C. 292, 287 F.2d 146, cert. den. sub nom. Hope Natural Gas Co. v. P.S.C. of State of New York, 365 U.S. 880, 81 S.Ct. 1031, 6 L.Ed.2d 192; Shell Oil Co. v. P.S.C. of State of New York, 365 U.S. 882, 81 S.Ct. 1030, 6 L.Ed.2d 192; People of State of California v. F.P.C., 9 Cir., 353 F.2d 16, affirming 32 F.P.C. 34.

After some of the petitions for review were filed in these cases [26] the Supreme Court decided *Callery* [27] reversing the decision of this Court [28] and holding that (a) in a § 7 certificate proceeding the FPC is not required to consider cost, economic and related evidence; (b) it has the power to condition permanent certificates to forbid the filing of rate increases above a specified level for a limited period of time, and (c) it has the statutory authority to order refunds of amounts collected pursuant to permanent certificates which were subsequently judicially reversed.[29] The Court approved FPC orders which conditioned permanent certificates at a price in line with the price level at which substantial amounts of gas had been certificated to enter the interstate market under contemporaneous certificates.

### The "In-Line" Conclusions Reached

The FPC having been vindicated in the use of an in-line price method, there remains the question of whether the Commission's determinations of in-line price levels in these cases are supported by the evidence and are well founded in law.[30]

Of the sales for which permanent certificates were issued by the order in Turnbull and Zock, some were contracted before September 28, 1960, some between that date and August 31, 1962, and some thereafter.[31] There is significance in these dates because of the effect

of the Statement of General Policy [32] No. 61-1, issued on September 28, 1960, and the Fifth Amendment thereto [33] issued on August 30, 1962. Among other things this policy statement established guide line prices for each marketing area, below which the FPC would exercise its rate and certificate powers without full investigation and hearing, unless there were objections. New sales that were contracted for prices above the guide line would not be allowed to start above that level. Thus, by observing the guidelines Producers could generally avoid involvement in the investigation, hearing and regulatory procedures they would otherwise have to go through.

As before noted, we are here concerned with both pre-Policy and post-Policy sales contracts, which were ultimately authorized by permanent certificates conditioned so that the initial price for sales contracted prior to September 28, 1960, should not exceed 15¢ per Mcf and those thereafter 16¢ per Mcf.

These in-line certificate prices for District 4 have been considered and upheld by the Court of Appeals for the District of Columbia and the Tenth Circuit. In *Skelly* [34] the District of Columbia Circuit concluded that, in the period prior to September 28, 1960 (the Statement of General Policy date) [35] the FPC could declare an in-line price of 15¢ per Mcf for District 4.

26. Nos. 21286, 21575 and 21856 previously filed were held in abeyance pending the outcome of *Callery*.

27. United Gas Improvement Co. et al. v. Callery Properties, Inc. et al., 382 U.S. 223, 86 S.Ct. 360, 15 L.Ed.2d 284 (1965).

28. Callery Properties, Inc. v. FPC, 5 Cir. 1964, 335 F.2d 1004.

29. These issues, some of which were controverted before the Commission and raised in this review proceeding, are now set at rest by *Callery*.

30. Our discussion is first directed to the petitioners under Turnbull and Zock. See note 1 supra. The petitions in Hunt,

notes 12, 13 and 15 supra, are treated subsequently unless otherwise noted.

31. Temporary certificates had been granted for all but one (which is not here under review) of these sales under F.P.C. Regulations and under the Natural Gas Act, § 157.28 (18 C.F.R. 157.28).

32. 24 FPC 818.

33. 28 FPC 441.

34. Public Service Commission of State of New York v. FPC, 1964, 117 U.S.App. D.C. 287, 329 F.2d 242, cert. den. sub nom. Prado Oil and Gas Co. v. FPC, 1964, 377 U.S. 963, 84 S.Ct. 1644, 12 L. Ed.2d 735.

35. See note 32 supra.

In *Sunray DX*[36] the Tenth Circuit considered contracts dated between September 28, 1960,[37] the date of the issuance of the initial Statement of General Policy and August 30, 1962,[38] and concluded that the FPC could declare an in-line price of 16¢ per Mcf for District 4.

■ Like their *Skelly* and *Sunray DX* counterparts the Turnbull and Zock applications, here under consideration, involved sales in the same producing area, both before and after September 28, 1960, some by the same producers. We are in agreement with *Skelly* and *Sunray DX*, upholding the in-line price determination of the FPC and conclude that in these cases its action on that issue should be affirmed.

### The Pre-Policy Statement 15¢ Level

Without belaboring the analysis of prices in District 4 made by the Examiner and approved by the FPC, a recapitulation for the period January 1, 1958, through September 27, 1960, shows this. The average of all the permanently certificated sales weighted by volume is 14.20¢ per Mcf. Out of 39 temporary certificates 38 were issued at prices between 16.0¢ and 18.0¢ per Mcf. The largest number of contracts and the largest volumes were at 15.0¢ per Mcf. And the average between the median price and the highest group of prices is 15.14¢ per Mcf.

■■ The FPC's finding of an in-line price of 15¢ is based upon the principle that the price line is not established by the highest price or prices permanently authorized, but falls between the highest group of prices and the median price. We think this is a permissible criteria to apply. The Producers emphasize heavily the statement in *Callery*[39] that: "We believe the Commission can properly conclude under § 7 that adequate protection to the public interest requires as an interim measure that gas not enter the market at prices higher than existing levels." But, as the Tenth Circuit observed in *Sunray DX*,[40] "This language does not mean that the public interest is not protected if the sales are approved at less than existing levels." This conclusion is consonant with *Catco's* admonition to halt the escalation of prices that had been and were taking place.

### Distinctive Objections

■ Various Producer-petitioners assert special contentions not joined in by all, thus Continental[41] urges that the exclusion of intrastate data from the price line determination was arbitrary and capricious. Except for the testimony of one witness concerning nine sales, four of which are jurisdictional and five of which are non-jurisdictional, there was no comparison of intrastate prices with interstate prices because the former were unavailable. We agree with the FPC that this evidence was too fragmentary to support an inference that intrastate prices make it advantageous for sellers to market their supplies under non-jurisdictional contracts.

■■ Continental also contends that in four separate § 7 proceedings since 1962, involving the same area, the FPC has not found it necessary to use prices below 14¢ in finding this to be the price-line, but here it could not use the same type data and get the answer it wanted, so it used data for sales below 14¢. Except when such sales are not generally comparable to Producer sales, we see no reason why they should not be considered in order that the in-line price determination might be based on a complete range of relevant price data. In any event, we are not impressed with Continental's attack on the non-exclusion of below 14¢ sales here for, whatever weight the FPC gave such sales, it was not enough to change its in-line determination from the

36. Sunray DX Oil Company et al. v. FPC, 10 Cir. 1966, 370 F.2d 181, now pending on petition for certiorari.

37. See note 32, supra.

38. See note 33, supra.

39. 382 U.S. 223, 227, 86 S.Ct. 360.

40. See note 36 supra.

41. No. 23188.

15¢ it found in *Skelly* which the District of Columbia Circuit approved.

■ Continental, joined by Hunt, complain that the FPC did not give them notice of the FPC's standards and adequate opportunity to meet the standards. We have already discussed some of the Producer's objections advanced to support this charge. We note that the Hunt hearing, after court remand, began on March 28, 1962, and that the Turnbull and Zock proceeding was not initiated until May 28, 1964. In 1959 *Catco* decided that the FPC is not obligated in § 7 proceedings to determine the just and reasonable price for the gas sold, it being sufficient to determine the in-line price. In applying this concept many decisions thereafter dealt with the interpretation of the in-line standard, and the weight to be accorded various kinds of evidence in applying that standard.[42] Furthermore, the FPC by its decision in Continental Oil Co., 27 F.P.C. 96, July 22, 1962, made clear that contemporaneous sales price data were of major importance. Again, on March 21, 1962, in Ohio Oil Co. et al., 27 F.P.C. 551, the determining factor was said to be contemporaneous sale price data. By May 28, 1964, (when the Continental proceeding was initiated) *Skelly* had been affirmed by the District of Columbia Circuit and the FPC had fixed the initial prices in its *Amerada* case. Thus all parties were on notice of the standards to be applied and given an adequate opportunity to present relevant evidence. The situation therefore in no way resembles that in Hill, Trustee v. F. P. C., 5 Cir., 1964, 335 F.2d 355.

Austral contends that it was discriminatory for the FPC to make applicable to it the in-line price of 15¢ based upon permanently certificated sales under contracts dated between January 1, 1958, and September 28, 1960, even though Austral's sale was made pursuant to a contract with Natural Gas Pipeline Company dated September 1, 1960. Austral argues that the cut-off date of September 28, 1960, is arbitrary and that sales made under contracts thereafter should be considered.

■ The Commission used September 28, 1960, as a cut-off because on that date it issued Statement of General Policy No. 61–1 and thereby established guideline prices. The evidence shows that as a result of this regulatory action there was a change in the level of contract prices. We agree with the Examiner that "A comparison of prices both before and after September 28, 1960, would therefore be a comparison of prices based upon dissimilar circumstances and would not reflect the current conditions in the industry." Both *Skelly* and *Sunray DX* have accepted the separate time periods as appropriate, and we think this is in keeping with the public convenience and necessity.

### Hunt Petitions

Proceedings in these cases (see notes 12, 13 and 15) were stayed by the court pending the outcome of *Callery*. That decision settled the contentions of the Producers that the FPC lacked the power to exclude cost evidence in a § 7 proceeding, to order refunds of rates collected during temporary authorization, and to impose a moratorium on the filing of price increases as a condition to the issuance of permanent certificates. Petitioners now contend that the FPC improperly exercised the power it was found to have.

### Hunt's Procedural Complaints

■ We have above discussed and rejected these petitioners' argument that they were denied administrative due process because they did not receive notice that the only evidence that would be considered would be that relating to the in-line price. To this we would only add here that these petitioners elected to disregard the burden cast upon them to sustain the in-lineness of their rates. Rather they simply took and stood upon the position of respondents, who have no burden of proof.

---

42. See cases collected in note 25.

These petitioners also argue that they were denied the opportunity to submit rebuttal evidence concerning Staff Exhibit No. 236, which was intended to update Staff Exhibit No. 60 previously used in the original proceeding which had culminated in the granting to petitioners of permanent certificates that were subsequently set aside and replaced with temporary certificates.[43] Petitioners were granted a three weeks' recess in which to prepare for cross-examination, and when the hearings resumed they asked for a further adjournment of some two weeks to prepare rebuttal evidence. The Examiner refused to grant a further continuance. Under the circumstances we find no abuse of discretion.

### In-Line Determinations

Petitioners' contracts for the sale of gas here on review were dated May 15, 1959. Petitioners attack the FPC's determination of the in-line price to be 15¢ for Texas Railroad Commission Districts Nos. 2 and 4 and 16¢ for Texas Railroad Commission District No. 3. They particularly object to the exclusion of permanently certificated sales to Coastal Transmission Company and Truckline Gas Company as being "suspect", the period of time utilized for comparability, and the use of estimated rather than actual volumes.

As the petitioners adduced no evidence, the in-line prices were determined by considering the various sales permanently certificated for the calendar years 1958 to September 28, 1960, as shown on Staff Exhibit No. 236, eliminating from consideration all sales at prices below 14¢ (about which petitioners do not complain). Sales only temporarily authorized were substantially eliminated. Sales that were suspect were not used.

In District No. 2 there were 29 sales at or below 15¢ per Mcf, having an estimated first month volume of 2,347,765 Mcf. There were six contracts having an estimated first month volume of 635,000 Mcf above 15¢ per Mcf. This we find was a sound basis for the FPC's finding of an in-line price of 15¢ for District No. 2.

In District No. 3 there were twenty-four permanently certificated sales having an estimated monthly volume of 886,995 Mcf at prices between 14¢ and 16¢ per Mcf. There were three at 16.14967 per Mcf with initial monthly volumes of 467,500 Mcf. The other prices were not considered, because they were either in litigation, under review or "suspect".

In District No. 4 with one exception that is insubstantial, there were no contracts permanently certificated at prices above 15¢ per Mcf, except those excluded in the same categories as in District No. 3.

Staff Exhibit 23 also included the sales relied upon by the FPC in *Skelly Oil*[44] and *Texaco-Seaboard, Inc.*[45] In these cases the FPC had found that the in-line price for District No. 3 was 16¢ and for District No. 4 was 15¢.[46] We think that the FPC acted properly in comparing the evidence in its Staff Exhibit here with the evidence in those cases and certainly had ample basis for concluding that there were no substantial dissimilarities sufficient to warrant a higher in-line price.

We are not impressed with the contentions of petitioners that actual instead of estimated volumes should have been used in the staff compilations. This was usual FPC procedure and is predicat-

---

43. In P.S.C. of State of New York v. F.P.C., 1961, 111 U.S.App.D.C. 153, 295 F.2d 140, cert. den. sub. nom. Shell Oil Co. v. P.S.C. of State of New York, 368 U.S. 948, 82 S.Ct. 388, 7 L.Ed.2d 343, it was held that the Public Service Commission of New York had been improperly denied leave to intervene in the certificate hearing and remanded the case

to the Commission. See also Hunt Oil Company v. FPC, 5 Cir., 1964, 334 F.2d 474.

44. 28 F.P.C. 401.

45. 29 F.P.C. 593.

46. The in-line price of 15¢ was affirmed by the District of Columbia Circuit in *Skelly*, supra.

ed upon the fact that the buyer and seller in determining price do not await deliveries but make estimates of reserves that are stated in their contracts. These estimates are one of the underlying elements in determining the consideration for the contracts and are probably a better criteria of existing market prices than are later variations from those estimates. *Skelly*, supra.

What we have heretofore said makes it unnecessary to extend this opinion further concerning petitioner's complaint that there is no comparability of contracts in point of time.

■ Finally, the petitioners challenge the in-line price of 16¢ in District No. 3, because the FPC disregarded as "suspect" the so-called Coastal and Trunkline sales. The petitioners urge that these sales are permanently certificated and not subject to any further FPC or court review, modification or infirmity. But we cannot say that the FPC acted arbitrarily and capriciously in excluding these sales, for the certificates surely would have been set aside had it not been for a procedural defect (an untimely petition for review filed by Public Service Commission of New York from the FPC's denial of intervention.[47] Thus, while review may be said to have been unsuccessful, we agree that there was an apparent infirmity and the FPC acted with a discretion that we refuse to overturn.

### 7% Interest in Refunds

■ Petitioners, while conceding that the Supreme Court in *Callery* upheld the imposition of interest on refunds as a means to prevent unjust enrichment, complain that 7% imposed in these proceedings[48] cannot be considered equitable, because the parties acted in good faith, and the rate of interest should be in line with the then currently effective present commercial practices, i. e., 4.5% (prime rate) fixed by the Federal Re-

serve Board and applied in various decisions by the FPC.

In *Callery* the interest assessed was 6% from the time that the gas first was certificated and at the rate of 7% from the time that the initial certificates were set aside and temporaries were issued in place thereof. The Supreme Court affirmed the assessment of interest, *Callery*, 382 U.S. at 230, 86 S.Ct. 360. Here the FPC, unlike *Callery*, did not require petitioners to refund the difference between the price collected under the original certificates while they were in effect and the ultimately certificated in-line price but imposed a refund obligation only from the time the temporaries were issued and ordered interest only from that date. This was far more favorable to the petitioners than was the procedure in *Callery*.

On remand of *Callery*, this Court by its order of March 29, 1966, summarily denied the petitioner's contention similarly here made that the FPC's orders should be modified to reduce the interest rate to 4½ percent, instead of that of 6 and 7 percent as prescribed.

The 4.5% rate applied by the FPC in other refund cases is not comparable, because the FPC applies this rate only when the company is directed to retain the refundable amount pending a determination of the proper distribution.

We conclude that the 7 percent interest imposed by the FPC was permissible. Mississippi River Fuel Corp. v. F. P. C., 1960, 108 U.S.App.D.C. 284, 281 F.2d 919, cert. den. 365 U.S. 827, 81 S.Ct. 712, 5 L. Ed.2d 705; Texaco, Inc. v. F. P. C., 5 Cir., 1961, 290 F.2d 149.

### Change in Rates to Avoid In-Line Limitations

Upon the promulgation of Opinions 412 and 412A setting an in-line price of 15¢ for Districts 2 and 4, and the orders of February 24 and March 20, 1964, establishing a moratorium of 18¢ petitioners in No. 21856[49] while collecting

---

47. Public Service Commission of State of New York v. F.P.C., 1960, 109 U.S.App. D.C. 66, 284 F.2d 200.

48. Opinion 412, par. (f), 30 F.P.C. 1438.

49. See note 15, supra.

18¢ filed a notice of change under § 4 (e) from the price ultimately approved in these proceedings (15¢ per Mcf if the opinions 412 and 412A are upheld) to the 18¢ moratorium ceiling. Their second rate filing was rejected on the ground that the petitioners were already collecting 18¢ and the FPC's order directing them to reduce the price to 15¢ was stayed during this appeal.

In District 3 the petitioners who were collecting 20¢ per Mcf filed a notice of rate change that fixed the price at 19¢, which was accepted by the FPC, suspended for five months and made subject to a § 4(e) rate proceeding.

Petitioners contend that the rejection of the rate change in Districts 2 and 4 was erroneous and discriminatory.

▮▮▮▮ We think that the FPC's interpretation of the Act was correct. Since the attempted filing price and the one the petitioners were collecting was identical, there was no change, and we conclude that only filings that do change the sales price are authorized by the Act. Cf. Amerada Petroleum Corp. v. F. P. C., 10 Cir., 1961, 293 F.2d 572. There was no discrimination in accepting the filings in District 3 because there was a change—a reduction in the cost of gas to the purchaser.

The remaining error relied upon by these petitioners, asserting that the imposition of a price moratorium on the filing of increases above 18¢ and 19¢ until January 1, 1968, was unlawful is deferred to our discussion of a similar point raised by the other petitioners. In all other respects we conclude that the points the Hunt petitioners raise are without merit.

*The Post-Policy Statement 16¢ Level*

The Distributor-petitioners [50] object to the FPC's finding of an in-line price in District 4 of 16¢ per Mcf after September 28, 1960. They contend that the line price found by the FPC in a contested hearing under proper procedures (here 15¢ per Mcf before September 28, 1960) remains fixed until the applicable area rate proceeding is concluded and the just and reasonable rate is made effective.

The FPC in establishing an in-line price after September 28, 1960, considered sales and initial prices contracted for those sales during the post-Policy Statement periods. The first period extended from September 28, 1960, when the Policy Statement fixed a guideline price of 18¢ for new gas in District 4, until August 30, 1962, when the Fifth Amendment changed that price to 16¢. The second period was from August 30, 1962, through March 25, 1964.

During the first period the estimated first month volumes of gas under non-suspect sales was only 256,576 Mcf, as compared with 4,470,796 Mcf for all gas first entering interstate commerce. There were 34 sales permanently certificated in the *Amerada* case [51] at a conditioned price of 16¢ per Mcf accounting for an estimated first month's volume of 2,549,320 Mcf.

During the second period the estimated first month volume of gas under non-suspect sales was only 910,691 Mcf, as compared with 6,439,858 Mcf for all gas flowing.

There were 26 temporary sales at 16¢ per Mcf related to the contracts in issue here with an estimated first month's volume of 5,379,168.

In making a determination of the in-line price for the sales contracted during the period from the first Policy Statement, September 28, 1960, to the date of the Fifth Amendment, August 30, 1962, while the 18¢ guideline price was in effect, the Examiner considered evidence as to both permanently certificàted and temporarily authorized sales contracts and having compared this evidence with

---

50. See note 7.

51. *Amerada* was then pending on petition for review in the Tenth Circuit and was therefore labeled suspect by the Exam-

iner. Amerada Petroleum Corp. et al. 31 F.P.C. 623, petition for review sub nom. Sunray DX Oil Co. et al. v. F.P.C. —now decided, 370 F.2d 181.

the pre-Policy Statement period price of 15¢ concluded that 16¢ should be the maximum initial price appropriate in the interest of public convenience and necessity, reflecting the current conditions in the industry during this period.

Coincident with the FPC decision in *Amerada* on August 30, 1962, the FPC by the Policy Statement Fifth Amendment lowered the guideline price to 16¢, and in determining the in-line price for the period subsequent to this date the Examiner gave some weight to the temporarily certificated sales related to the contracts here in issue. He noted that the large number of contracts entered into the 16¢ per Mcf reflected the effect of the Policy Statement Fifth Amendment and that some weight should be given to this consequence of the regulatory action by the FPC. The Examiner, subsequently adopted by the FPC, found 16¢ per Mcf to be the in-line price for this period.

The Distributors, both in oral argument and in their briefs, rely upon the same reasons and arguments as they advanced to the Tenth Circuit in Sunray DX Oil Company et al. v. F. P. C., supra, for urging that the FPC erred in holding that the in-line price in District 4 had advanced in the Post-Policy Statement period.[52]

We are in full agreement with the reasoning and conclusions reached by the Tenth Circuit in *Sunray DX*. This decision fully answers the Distributor's contentions concerning sales subsequent to September 18, 1960, and we therefore borrow from it heavily.

■■ With reference to the position of the Distributors that the 15¢ price established in *Skelly*, Opinion No. 362, for contracts executed prior to the date of the Policy Statement is the in-line price rate which is presumed to continue

until a just and reasonable rate has been determined, the court said:

"We agree with the distributors that the in-line procedure is an interim device and is not intended to be a permanent method of producer regulation. It is a necessary device because of the complex and time-consuming processes incidental to the establishment of a just and reasonable rate. The apparently inevitable time lag between certification and establishment of a just and reasonable rate affects the mutability of an established in-line price.

"The Commission has recognized that the in-line price must reflect current conditions. The Courts of Appeals have agreed. Further support is found in the *Callery* decision where the Supreme Court referred to 'other contemporaneous certificates' and 'prices higher than existing levels.' We concur with the Commission that once the in-line price is established it is presumed to continue not until the just and reasonable rate is determined but until 'substantial evidence is presented that it has changed.'" Id. at 187, 188.

### Temporaries as Suspect Prices

■■ Concerning the Distributors' argument that the FPC considered and acted upon suspect prices, the court supported the FPC's consideration of prices under temporary authorizations because permanently certificated prices covered only a small percentage of total volumes for the period involved. It recognized that permanent certificates have a greater weight than either temporary certificates or contract rates under attack in the determination of an in-line price. But the court, nevertheless, went on to say:

"At the same time, when no appreciable volume of gas is moving under permanent certificates, the Commission has nothing upon which to base a de-

52. The Distributors also assert here that there is no showing of a public necessity for the gas supplies for which con-

tested certificates were issued, which is treated infra.

cision as to in-lineness unless it turns to the temporaries. * * * "

"An in-line price is intended to reflect the price at which substantial volumes of gas are currently contracted for sale in interstate commerce. This determination cannot be made if all current sales are within the 'suspect price' doctrine because of objections made to them. Such an application of the doctrine would, as said by the Commission, make the price determination dependent on the 'unreviewable fiat' of the objectors. Our conclusion is that in the circumstances of this case the Commission did not abuse its discretion by the consideration given to prices not covered by permanent certificates." 370 F.2d at 189.

 Referring to Distributors' argument that under Atlantic Refining Co. v. Federal Power Commission, 1963, 115 U. S.App.D.C. 26, 316 F.2d 677, if the FPC is to err in setting an initial rate, it should err on the low side because of the right of a Producer to immediately file for a rate increase under § 4. The court in *Sunray DX* rejecting this argument said:

"The provisions of § 4, although they may not be disregarded, are not a complete answer. Rate increases filed thereunder are subject to suspension. The producers may have the use of the money collected but it is at interest if refunds are ordered and royalty and tax payments have to be made on the total amount collected. If the just and reasonable rate as finally determined is greater than the in-line rate adopted, the producers have no way of recouping their loss. Our view is that the possibility of filings for increased rates under § 4 does not require that the Commission fix the price in a § 7 proceeding at a figure lower than that at which substantial volumes of gas are currently contracted for sale in interstate commerce." 370 F.2d at 190.

 Finally, we fully concur in the summary and conclusions reached by the Tenth Circuit in *Sunray DX* so aptly put as follows:

"It is apparent that in the case at bar the Commission was confronted with a difficult situation. CATCO tells it to hold the line. The Ninth Circuit UGI decision says that the price line is intended to reflect current conditions and that the prices on which it is based must be those under which substantial quantities of gas move in interstate commerce. Various decisions warn against the use of suspect prices. Because of objections to most pertinent certificate applications, the number of permanent certificates available for comparison purposes represents only a meager amount of gas. The Commission took due note of all factors and concluded that the price required by public convenience and necessity is 16 cents. We believe that in so doing the Commission acted reasonably and that 'we owe it the same deference to its expertise that courts generally owe to the specialized boards and commissions created by the Congress to deal with complex and difficult problems in the field of economic regulation'. We find no abuse of discretion and affirm the 16-cent price." 370 F.2d at 190–191.

We are quite aware that the District of Columbia Circuit, in Public Service Commission of the State of New York v. Federal Power Commission, 373 F.2d 816 [Feb. 7, 1967] refused to accept the reasoning of the Tenth Circuit in *Sunray DX*. To the contrary, adopting the Distributors' contention here made the District of Columbia Circuit did freeze the in-line price during the interim period between the sale of gas and the rate determination under § 4 or § 5 of the Act on the logic of *Catco*. As we stated at the outset, we align ourselves with the Tenth Circuit's *Sunray DX* and the Ninth Circuit's holding that " * * * the 'line' referred to in Catco may properly be referenced to relevant existing producer prices under which substantive amounts of natural gas move in interstate commerce * * *." UGI v.

Federal Power Commission, 9 Cir., 1960, 283 F.2d 817.

### Relevance of Public Need

 In addition to the reasons advanced in *Sunray DX*, and as a separate basis for reversal here, the Distributor-petitioners urge that the FPC's holding that the issue of public need properly belongs in pipeline certificate cases, not producer applications, is erroneous. Consequently the total absence of formal record evidence of a public need for the gas supplies here involved invalidate the contested certificates authorizing the sales. The District of Columbia Circuit agrees with this view. In Public Service Commission of State of New York v. F. P. C., supra, that court found that there was no showing of public need and that such a decision must be made before a permanent certificate is granted to a producer.

With deference we disagree. *Callery* simply cannot be squared with any contention that would result in such proliferation of issues and evidence in § 7 proceedings. Congress intended that the FPC would pursue regulatory methods which would permit performance of the task. The FPC has been encouraged to devise reasonable means of streamlining its procedures. Federal Power Commission v. Hunt, 376 U.S. 515 at 527, 84 S. Ct. 861, 11 L.Ed.2d 878. The FPC should and does have discretion to consider the question of public need in rule making proceedings or in pipeline certification cases.[53] The complaint that the delay in the adoption of any rule is a good example of the inadequacy of the rule making process underscores the inappropriateness of injecting a public need issue in § 7 proceedings.

Where there are hundreds of producers in § 7 proceedings who cannot have any knowledge of ultimate demand, the result would be either a forced intervention of the pipelines and prolongation of the hearings, or possible collateral attack on the pipeline certificate cases. To force a general consideration of need in § 7 proceedings would force consideration of that type of market evidence whose exclusion *Callery* specifically sanctioned on the price issue. California Oil Company, Western Division v. Federal Power Commission, 10 Cir., 1963, 315 F.2d 652; Texaco, Inc. v. Federal Power Commission, 5 Cir., 1961, 290 F.2d 149.

We decline to require an enlargement of what, until now, has been decided to be the scope of a § 7 proceeding.

### Price Increase Moratorium

Producer-petitioner Blanco[54] objects to the certificate condition imposing an 18¢ ceiling on prices until January 1, 1968, or the area rate determination, whichever is earlier.[55] Blanco argues that there is nothing in the record to support the FPC's determination that "the level at which prices will be triggered or redetermined is apparently at the 18¢ price level * * *."

Bound to comply with *Catco*, the FPC's moratorium policy was evolved because initial price regulations alone did not suffice to hold the line. This policy was first accomplished by the issuance of temporary certificates imposing a moratorium on the filing of any increase in the initial price during the term of temporary authorization. In Hunt v. Federal Power Commission, 5 Cir., 1962, 306 F.2d 334 we held that the FPC had no power to condition a temporary certificate upon the maintenance of a prescribed price.

---

53. In the rule making Docket R–199 the take or pay problem has been considered on an industry-wide basis. Order No. 334, January 18, 1967. The certificates here in suit are included in this proceeding.

54. See note 1, supra.

55. Austral (see note 1 supra), although making the same objection in its peti-

tion, conceded in its brief, filed after *Callery*, that this decision was dispositive of the error asserted by Austral as to the imposition of a price increase moratorium. Bright and Schiff (see note 1, supra), who initially made the same objection, by order dated June 21, 1966, was permitted to withdraw its Petition for Review and the proceeding as to it was dismissed.

The Supreme Court reversed, Federal Power Commission v. Hunt et al., 376 U.S. 515, 84 S.Ct. 861, 11 L.Ed.2d 878. In Callery Properties, Inc. v. Federal Power Commission, 5 Cir., 1964, 335 F. 2d 1004, we held that the Natural Gas Act forbids a moratorium on price increases as a condition to the issuance of a permanent certificate. Again the Supreme Court reversed. *Callery*, supra.[56] Thus the FPC's power to impose a moratorium was unquestionably set at rest.

■ In our view the petitioner here fails in establishing that rate increases above the 18¢ level will not result in triggering of contracts and price escalation.

Blanco argues the negative, that although there are contracts that could be triggered by price increases above 18¢, there is no evidence that this will be done. We reject this and refuse to leave it to the purchaser's decision whether or not for one reason or another they may or may not act. If a rate filing for more than 18¢ is permitted, it would upset much that the FPC has succeeded in accomplishing to comply with *Catco*.

Producer-petitioners Hunt[57] object to the imposition of a price moratorium on the filing of increases above 18¢ in Districts 2 and 4 and 19¢ in District 3, again on the premise that there is no evidence to support either the price or time limitation.

The FPC raises a threshold question in No. 21575 that the petition was premature because, although the FPC's order of April 17, 1964, denied the application of petitioners for rehearing of that part of the opinion and order 412–A, dated March 20, 1964, which imposed a moratorium on price increases, by footnote it invited a response setting forth any basis for a factual disagreement, and petitioner, on May 14, 1964, filed such a motion which remained undisposed of on May 27, 1964, when the petition in No. 21575 was filed. Then on September 29, 1964, an order was entered by the FPC refusing to modify the moratorium condition and petitioners did not seek rehearing or court review.

■ Under the circumstances above related, with the FPC on March 20, 1964, expressly denying the petition for rehearing, there was as to this question of law a sufficient compliance with § 19 to warrant the petition for review. Consequently the question raised by the petitioner is properly before us.

■ ■ On the merits we are persuaded that the temporary moratorium on the filing of price increases in Districts 2, 3 and 4 was a reasonable exercise of the FPC's power. The rates petitioners rely upon as being higher than the moratorium ceiling were themselves rates that had been redetermined under contract clauses triggered by the petitioner's collections of the sales prices here involved, plus an 18¢ sale to United Gas Pipeline Co. Since the rates were being collected, and disregarding the liability to make a refund, the redetermined rates were 19.33333¢ per Mcf. We agree with what the FPC had to say in its order denying petitioner's motion for amendment of the moratorium condition:

> "It is sufficient here to indicate that for purposes of imposing a moratorium against possible price increases above the triggering ceiling we cannot consider prices which are themselves based on a price we have held to be too high and which was the subject of a hearing on this question at the time of the redetermination: In fact the situation here well illustrates the mushrooming effect that an out-of-line price for a given sale may have on other sales in the area through redetermination clauses and clearly does not justify a bootstrap operation raising the moratorium level we had set." 32 FPC 874 at 876.

While there were no rate increases in Districts 2 and 4 which had led to a price redetermination, the possibility that this might occur prompted the FPC to do what it could to preclude this from becoming a reality.

---

56. See note 27 supra.

57. See notes 12, 13 and 15, supra.

The Tenth Circuit very recently, in upholding the FPC's imposition of a moratorium, said in the Permian Basin Area Rate Proceeding [58] that the FPC not only had the power to declare a moratorium but that "[t]he reasonableness of the exercise of the power is established by the need for price stability, the Commission's expressed willingness to reopen the proceedings to consider the propriety of changes, and the expiration date which is only about a year off." We find no error in the imposition of the moratorium.

### Denial of Exceptions from In-Line Price Levels As to Shell

Producer-petitioner, Shell Oil Company (No. 23408), does not attack the in-line price level determined by the FPC in Opinion No. 478, but insists that, under the circumstances, there is a compelling justification requiring an exception to the application of the in-line price to it.

In 1959 Shell contracted with Coastal Transmission Corporation to sell it gas from Texas Railroad Commission District No. 4 at an initial price of 16.5¢ per Mcf. This sale was to supply gas for Coastal's first major expansion of its pipeline. In Opinion 478 the FPC issued to Shell a permanent certificate with a price condition reducing the original price, which Shell can collect under its contract from 16.5¢ per Mcf to 15¢ per Mcf. Subsequently [59] the FPC provided that the initial contract rate would be applicable only from the date of initial delivery to the date the first rate increase was placed into effect subject to refund, on April 1, 1963. After that date the conditioned 15¢ per Mcf rate operated only as a "filed rate" or refund floor, pending the determination of the justness and reasonableness of Shell's rate as a part of the Texas Gulf Coast Area Rate Proceeding.[60]

The "compelling justification" upon which Shell relies is that sales to Coastal contracted in 1955 to supply gas to Coastal's projected original pipeline including one sale from Gulf [61] at the same price as Shell's contract here, were treated as exceptional by the FPC and excluded from consideration in making inline price determinations. It is Shell's position that "if the Commission was correct in the factual distinction it drew in the *Skelly* and *Texas Seaboard* cases, which was confirmed * * * in *Public Service Commission of New York*, then this same factual distinction serves as a strong reason for not applying the inline price to other sales to Coastal."

We think the FPC was warranted in concluding that the early sales were "* * * to a new company (Coastal) that had neither been given a certificate nor was yet in operation, and so may have taken place at higher prices than would have occurred under contracts with an established pipeline because of the inclusion in the price of an additional risk factor * * *." [62] This was an exceptional situation because at that time Coastal was in a promotional stage. But in 1959 the pipeline had been constructed, was in operation, and its certificate proceedings were judicially determined. We are not at all persuaded by Shell's argument that the same risk existed on the contested pipeline expansion as existed on the initial pipeline certification. We think that the FPC's conclusion of lack of comparability of Shell's sale with the exceptional original sales is amply borne out, and that the difference in price between that allowed Shell in 1959 and that allowed Gulf in 1955 cannot therefore be said to be discriminatory.

### Austral, Blanco, Etc.

On September 1, 1960, Producer-petitioners Austral, Blanco and Killian and Hurd contracted with Natural Gas Pipe-

**58.** Skelly Oil Co. et al. v. Federal Power Commission, 10 Cir., 1967, 375 F.2d 6, January 20, 1967.

**59.** Order Denying Rehearing, Opinion No. 478, November 24, 1965.

**60.** AR 64–2, covering District 4.

**61.** Docket No. G–10127.

**62.** Texaco Seaboard, 29 F.P.C. 593, at 598.

line Company of America to sell it natural gas for a total initial price of 20.045¢ per Mcf. The temporary certificates subsequently issued to these Producer-petitioners contained a condition reducing the total initial price to 18¢ per Mcf. These Producers urge that the flexible take provisions of their contracts, which make them useful to absorb swings in the pipelines' gas supply needs and as a "storage" facility, is a premium feature for which they are entitled to an increment over the otherwise applicable in-line price.

The Examiner allowed ½¢ per Mcf because of the flexibility provisions of the contract. The FPC overruled the Examiner and refused to allow any price increment for the so-called premium features.

The FPC found that there were a substantial number of contracts with the same pipeline having exactly the same flexible take provisions and that no extra allowance had been granted over the in-line price in any of the certificated cases. "Moreover, the feature is present in all but two contracts executed by the pipelines or its predecessor * * * for purchases in District No. 4 since September, 1960 * * *." This led the producers to contend that it is arbitrary and capricious for the FPC to consider sales under contracts dated prior to September 28, 1960 (the Policy Statement date) to determine the in-line price for the producer's sales and then look to sales under contracts dated after September 28, 1960, to determine whether the premium features of the sales are unusual. They submit that, if the FPC insists upon using an arbitrary cut-off date for in-line price purposes, then it must use the same cut-off date for determining whether particular features of a sale are unique. We do not agree. The periods before and after September 28, 1960, were separately considered by the FPC in establishing in-line pricing because with ample justification it was felt that the Policy Statement had introduced a new element affecting the in-line price. But the fixing of a period "before" and "after" in reference to the policy statement is irrelevant in connection with contracts having flexible take provisions and those that did not, since such provisions are not responsive to the Policy Statement. We think that the FPC's refusal of a premium price allowance to the Producer, based upon a comparison of contracts dated after September 28, 1960, was supported by substantial evidence.

### The Refund Issue

Some of the parties submit that they are entitled to a prompt decision of the refund question. The issue is whether the FPC has the authority under § 7 of the Natural Gas Act to require the Producer-petitioners to refund amounts above the in-line prices previously collected by them pursuant to temporary certificates which contained no express refund condition.

The FPC urges that, in the present posture of the case, the Producers are not aggrieved by the deferral of the refund issue by the FPC and contend that the challenge to the FPC's refund authority is premature, because the FPC has not determined as to any of the petitioners that it has the power to order refunds and, if so, how much is due. This is literally so. But whether it is really so may be quite another matter.

On September 30, 1965, the FPC, in Opinion 478, rehearing denied November 24, 1965, held that "* * * the decision whether refunds should be ordered as a condition to the permanent certificates is deferred for subsequent determination."

However, on July 25, 1966, the FPC in Opinion 499 [63] stated that "It is now established that the Commission has both the power and the duty to order refunds where amounts in excess of the in-line price have been collected by a producer operating under a temporary certificate without specific refund conditions." The

---

63. This is a part of the Turnbull and Zock proceeding which was the subject of Opinion 478.

FPC further said: "Accordingly, refunds will be ordered of all amounts collected in excess of the in-line price established in this proceeding during the periods producers were operating under temporary certificates, * * *."

The FPC on September 2, 1966, granted applications for rehearing of Opinion 499 to permit joint consideration of all applications and has taken no further action.[64]

■ We think that in view of the action taken by the FPC "the question of the power of the Commission to order refunds of amounts collected under temporary certificates containing no express refund condition is ripe for determination, and that proper judicial administration requires that it be deferred no longer."[65]

No consideration of healthy administrative procedure suggests either the necessity for or desirability of waiting further, requiring a new and second proceeding for review. Furthermore, the FPC's briefs in support of its petitions for certiorari to the Tenth Circuit cases[66] show that the FPC recognizes that the issue is alive.

The Producer-petitioners argue that the FPC had the power to insert an express refund condition in the temporary certificate, but it chose not to do so. Since the FPC's powers under § 7 are quasi legislative and therefore prospective in application, Arizona Grocery Co. v. Atchison Topeka and Santa Fe Railway Co. et al., 1932, 284 U.S. 370, 52 S.Ct.

183, 76 L.Ed. 348, it cannot now retroactively impose such a refund condition by awarding reparations of amounts previously collected by the Producers. F. P. C. v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333. Further, relying on the Tenth Circuit's earlier *Sunray Mid-Continent*[67] decision the Producers point out that there the court condemned the imposition of an express refund condition in a temporary certificate which did not provide a refund "floor" and held this to be unlawful, because it would require the Producers to commit their gas to interstate commerce without knowing the times and conditions applicable to the particular sale. They dismiss *Callery*[68] by stating that the touchstone of the FPC's refund power there was the fact that the FPC's orders "never became final" and were "overturned by a reviewing court". And their view of *Skelly*[69] is simply that the District of Columbia Circuit presumed the existence of the FPC's power to order refunds because it was not "clear from the Act that the Commission lacked power." This statutory construction, they contend, is plainly at odds with other decisions of that Circuit. Neild v. District of Columbia, 1940, 71 App.D.C. 306, 110 F.2d 246; Transcontinental and Western Air, Inc. v. Civil Aeronautics Board, 1948, 83 U.S.App.D.C. 358, 169 F.2d 893, affirmed 336 U.S. 601, 69 S.Ct. 756, 93 L.Ed. 911.

Events certainly fortified their position for the Tenth Circuit in its very

---

64. At the time of oral argument the court requested the FPC to make available from time to time any action taken by the FPC that might have a bearing on the issues to be determined in this review proceeding. There has been submitted to us Opinions and Orders of July 21, 1966 (492A), December 6, 1966 (498A and 501A), and December 8, 1966 (502A), in each of which the FPC denied rehearing and stay of Opinions 492, 498, 501 and 502, which directed partial refunds of amounts collected under non-refund conditional temporary authorizations in excess of ultimately determined in-line prices.

65. Sunray DX Oil Company v. F.P.C., supra, 370 F.2d at 192. See also Pan American Petroleum Corporation et al. v. F.P.C., 10 Cir., 1967, 376 F.2d 161; Standard Oil Co. of Texas et al. v. F.P.C., 10 Cir., 1967, 376 F.2d 578.

66. See note 65, supra.

67. Sunray Mid-Continent Oil Co. v. F.P.C., 10 Cir., 1959, 270 F.2d 404.

68. See note 27, supra.

69. See note 34 supra.

recent decisions [70] has held that unless the special considerations recognized in *Callery* are present, refunds may be ordered under § 7 only when a Producer contractually undertakes to make such refunds by the acceptance of a temporary certificate containing an express refund condition. The court, quite aware that in *Skelly* [71] the District of Columbia Circuit held that the power to order refunds does not depend upon an explicit refund provision in a temporary certificate, disagreed and expressed the view that this would lead to incalculable risks for the Producers. The court emphasized that in *Skelly* the application for permanent certificate covered sales under contracts executed before the Policy Statement, whereas in *Sunray DX* the contracts had been made between the date of the Policy Statement and the date of the Fifth Amendment, when the guideline initial rate was 18 cents. The court found this to be significant and meaningful and held that "When the producers dedicated their gas under temporary certificates permitting the collection of prices up to 18 cents without express refund obligation, they were entitled to rely on them." Sunray DX Oil Company v. F.P.C., 370 F.2d at 194.

Before the FPC's decision in Skelly Oil Co. et al., 28 F.P.C. 401, in 1962, it had taken the position that any error in granting a temporary certificate could be corrected by a refund order on permanent certification. Continental Oil Co. Opinion 251, 27 F.P.C. 96. After the Tenth Circuit's *Mid-Continent* decision [72] the FPC in Anaconda Petroleum Corporation et al., 29 F.P.C. 218, denied a motion by the Distributor-petitioner herein, that refund conditions be imposed on outstanding unconditional temporary certificates because to do so would have placed the FPC in the "* * * position of having induced producers to dedicate their gas to the market upon one set of

conditions, and then imposing more stringent conditions upon them." In January, 1964, the District of Columbia held in *Skelly* [73] that, even though a temporary did not contain an express refund condition, this did not preclude the FPC, under equitable conditions, from requiring refunds of excess amounts. Thereafter the FPC deferred action on refunds as heretofore related.

The vacillation of the FPC's position in the refund area must be attributed in no little degree to the uncertainties brought about by the various court decisions on the subject, in which there has been a conspicuous lack of unanimity. The conflict persists, as witness the Tenth Circuit's recent disagreement with the District of Columbia Circuit.

Viewed in the spectrum of *Catco* [74] to the present, we are persuaded that *Skelly* is sound and correct, and we adopt what the court there said:

"The basic purpose of the Natural Gas Act is consumer protection from unreasonable prices, and refund of excessive utility rates is a well recognized remedy. It would need to be quite clear from the Act that the Commission lacked the power to use such a remedy for the courts to deny it. We find no such clarity. The power does not depend upon an explicit refund provision in a temporary certificate. Should the occasion be appropriate for its exercise the power resides in the Commission when it grants a permanent certificate. To hold that it may not then require refund of excessive prices previously permitted without notice or hearing or mature consideration, since the Commission acted on an emergent and temporary basis, would be inconsistent with the regulatory responsibility of the Commission to aid in the ascer-

70. See note 65, supra.

71. See note 34, supra.

72. See note 67, supra.

73. See note 34, supra.

74. The Supreme Court placed a continuing responsibility on the FPC, in certificating procedures, to prevent "out of line" prices and to "hold the line awaiting adjudication of a just and reasonable rate."

tainment and authorization of just and reasonable rates." 329 F.2d at 249.

■ We think it basic that the in-line price technique was developed by the courts to make sure that the public interest, with its strong emphasis on consumer interest, was to be protected from the outset against excessive rates and charges. This is not to say that the power to refund *must* be exercised. If, as and when the power is exercised it must be shown that all equitable considerations involved have been explored and given due weight in the conclusion reached.

We think that the *Callery* rationale is persuasive in the circumstance of this case. The thrust in *Callery*—that the court would not permit the certification of sales of gas at prices exceeding that properly determined to be in the public interest—is identical with the critical issue here. The argument that excessive rates in *Callery* were collected pursuant to permanent certificates, the issuance of which was still the subject of judicial review, while the excesses here were accumulated under temporary authorizations that were not subject to judicial scrutiny, does not carry the day. The Producers knew that the authorizations they received were *temporary,* granted *ex parte* to provide interim relief. The contingency of the temporaries was made known to the recipients by the express condition embodied in them that:

> "This constitutes all requisite temporary authorization to commence the sale of gas, but such authorization and acceptance of the rate schedule are without prejudice to such final disposition of the certificate application as the record may require."

■ Whether or not this is characterized as "boiler plate" language it was sufficient in our opinion to put the Producers on notice of the possibility that refunds of excessive amounts might ultimately be required so that no higher price might be retained than the Producer was entitled to receive under a properly conditioned permanent certificate.

Although the argument was not pressed, the Producers whose contracts were executed after the Statement of General Policy No. 61–1, dated September 28, 1960, suggest that they are entitled to rely upon the price levels therein established, and thus the prices in their temporaries should not be subject to refund. This view was adopted in *Sunray DX*. At the moment, therefore, the District of Columbia Circuit in *Skelly* has held that the FPC has the power to order refunds in pre-Policy Statement contracts and the Tenth Circuit has held that the FPC does not have the power to order refunds in contracts entered into post-Policy Statement.

If the Policy Statement is considered in the context in which it was issued, we do not think that it bears upon the refund issue. In the Statement it is emphasized that, because of the volume of administrative burdens thrust upon it, means had to be found to carry out its duties, "* * * particularly in the interest of the consumer for whose protection the statute was enacted * * *." Further, it is said: "These price levels * * * are for the purpose of guidance and initial action by the Commission and their use will not deprive any party of substantive rights or fix the ultimate justness and reasonableness of any rate level."

With deference to the Tenth Circuit, we disagree with the reasoning in *Sunray Mid-Continent* and the decisions following it [75] insofar as those decisions reject the power of the FPC to order refunds, if it is made to appear that it is appropriate to do so, in whole or in part, after weighing all equitable considerations.

Other issues raised by the Producer and Distributor petitioners have been considered, and we find them to be without sufficient merit to extend this already too long opinion.

We conclude that there is substantial evidence in the record to sustain the find-

75. See notes 65 and 66, supra.

ings and action taken by the FPC in fixing the pre-Policy in-line price of 15¢ per Mcf for Texas Railroad Commission Districts 2 and 4 and 16¢ per Mcf for District 3, and the post-Policy price of 16¢ per Mcf for District 4; the denial of the several Producer-petitioners' claims for premium payments; and the imposition of the moratorium on price increases for the limited period established.

The cases are remanded for further proceedings consistent with this opinion.