In re **HUGOTON–ANADARKO AREA RATE CASE.**

The **PEOPLE OF** the **STATE OF CALIFORNIA,** and the Public Utilities Commission of the State of California, Petitioners,

v.

**FEDERAL POWER COMMISSION,** Respondent.

No. 71–1036.

United States Court of Appeals, Ninth Circuit.

July 31, 1972.

Lawrence Q. Garcia (argued), Mary Moran Pajalich, Rufus G. Thayer, Attys., Public Utilities Commission, San Francisco, Cal., for petitioners.

Charles F. Wheatley, Jr. (argued), William T. Miller, Grace Powers Monaco, Washington, D. C., Mark L. Goldstein (argued), Bernard Rane, Mathias M. Mattern, Asst. Corp. Counsel for Public Utilities, Richard L. Curry, Corp. Counsel, Chicago, Ill., Max P. Zall, City Atty., Denver, Colo., for intervenors American Public Gas Assn., City of Chicago, Ill., and City and County of Denver, Colo.

Leo R. Forquer, Sol. (argued), William P. Diener, Asst. Sol., J. Richard Tiano, First Asst. Sol., Gordon Gooch, Gen. Counsel, Federal Power Comm., Washington, D. C., for respondent.

Carroll L. Gilliam (argued), of Grove, Jaskiewicz & Gilliam, Washington, D. C., George J. Meiburger (argued), of Gallagher, Connor & Boland, Washington, D. C., Thomas G. Johnson (argued), Houston, Tex., Tom Burton, Houston, Tex., George C. Mastor, Minneapolis, Minn., Lloyd J. Marti, of Marti, O'Gara, Dalton & Bruckner, Lincoln, Neb., John F. Gaston, Joe A. Greenlief, Cedar Rapids, Iowa, Charles A. Crampton, Davenport, Iowa, Mark W. Putney, Des Moines, Iowa, Jack F. Kinney, Ira E. Delk, Sioux City, Iowa, C. S. Brubaker, Omaha, Neb., Arthur R. Renquist, Minneapolis, Minn., James Van Vliet, Jr., Chicago, Ill., J. P. Hammond, William H. Emerson, Tulsa, Okl., for intervenors Mobil Oil & Northern Producing Pipeline Co., Shell Oil Co., Continental Oil Co., Northern Distributor Group and Amoco Production Co.

Before HAMLEY, KOELSCH and DUNIWAY, Circuit Judges.

HAMLEY, Circuit Judge:

The People of the State of California and The Public Utilities Commission of the State of California (petitioners), proceeding under section 19(b) of the Natural Gas Act (Act), 15 U.S.C. § 717r, filed a joint petition in this court to review Opinion No. 586 and accompanying order of the Federal Power Commission (Commission). The opinion and order are reported at 44 F.P.C. 761 (1970). The American Public Gas Association, City of Chicago, Illinois, and City and County of Denver, Colorado, have jointly intervened here in favor of petitioners' petition and are collectively referred to herein as the consumer-intervenors.

The Commission's Opinion No. 586, and accompanying order, issued on September 18, 1970, determines rates for natural gas produced in the Hugoton-Anadarko Area.[1] Numerous natural gas producing, transmission and distribution companies, some individuals and a trust have intervened here in favor of respondent Commission's position.[2]

---

1. The Hugoton-Anadarko Area, one of the oldest gas-producing areas in the world, is comprised of the state of Kansas, Texas Railroad Commission District No. 10, the Oklahoma Panhandle (six counties), and the Anadarko Basin of Oklahoma (fifteen counties). The Hugoton and Panhandle Fields are the largest known gas fields in the United States.

2. The intervenors who have filed individual or joint briefs supporting the Commission herein are: The Northern Distributor Group (Central Telephone and Util-

By its order of November 27, 1963, 30 F.P.C. 1354, the Commission instituted a proceeding, pursuant to sections 4, 5, 10, 14, 15 and 16 of the Act (15 U.S.C. §§ 717c, 717d, 717i, 717m, 717n and 717o), to determine the just and reasonable rate or rates for the sales of natural gas subject to the jurisdiction of the Commission, produced in the Hugoton-Anadarko Area (Docket No. AR64–1), as well as for the Texas Gulf Coast Area (Docket No. AR64–2).[3] The Commission named several hundred respondents in the Hugoton-Anadarko portion of the joint proceeding. Joint hearings were held in these area rate proceedings.[4] The record in Docket No. AR64–1 (Hugoton-Anadarko) comprises one hundred and eighty-one joint and thirty-seven separate hearing volumes containing 28,650 pages; one hundred and thirty-four joint and seventy-three separate exhibits; and nineteen joint exhibits incorporated by reference from other area rate proceedings. The hearings commenced September 14, 1965 and concluded January 27, 1967.

On May 24, 1968, certain parties filed a Petition for Promulgation of Settlement Proposal. Responses were received from numerous parties; but the Commission took no action with respect to this settlement proposal. On September 16, 1968, FPC Examiner Max L. Kane issued his two-hundred-and-fifty-eight-page decision proposing rates in the Hugoton-Anadarko Area. This initial decision divides the rate structure as between the ancient, shallow, low-pressure Hugoton-Panhandle Field and the so-called Other Fields, which are newer, deeper and of higher pressure than the Hugoton-Panhandle Field. The initial decision established one set of prices for "new gas" from all fields and "old gas" from the Other Fields, and another set of prices for "old gas" from the Hugoton-Panhandle Field.[5]

ities Corporation, Iowa Electric Light and Power Company, Iowa-Illinois Gas and Electric Company, Iowa Power and Light Company, Iowa Public Service Company, Metropolitan Utilities District of Omaha, Minneapolis Gas Company, Northern States Power Company [Minnesota], Northern States Power Company [Wisconsin], and Northwestern Public Service Company), Amoco Production Company, Mobil Oil Corporation, Northern Natural Gas Production Company, Shell Oil Company, Diamond Shamrock Corporation, Amerada Hess Corporation, Getty Oil Company, Atlantic Richfield Company, Humble Oil & Refining Company, Cabot Corporation, Hunt Oil Company, H. L. Hunt, Caroline Hunt Sands, A. G. Hill, Alinda Hunt Hill, Secure Trust, Cities Service Oil Company, Placid Oil Company, Tenneco Oil Company, Sohio Petroleum Company, Texaco, Inc., The Superior Oil Company, Continental Oil Company, Phillips Petroleum Company, Marathon Oil Company, Dorchester Gas Producing Co., Skelly Oil Company, Gulf Oil Corporation, Sun Oil Company, Helmerich-Payne, Inc., Warren Petroleum Corporation and Pipeline Intervenors (Cities Service Gas Company, Kansas-Nebraska, Natural Gas Company, Inc., Colorado Interstate Gas Company, Natural Gas Pipeline Company of America, El Paso Natural Gas Company, Northern Natural Gas Company, Panhandle Eastern Pipe Line Company, and Transwestern Pipeline Company).

3. These two proceedings are two of a number of area rate cases that the Commission has been conducting to fix just and reasonable rates to be charged by producers of natural gas to pipeline companies for sale in interstate commerce. Such area rate cases are the means devised by the Commission to cope with the problem of producer-rate regulation thrust upon it by the decision of the Supreme Court in Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954).

4. The Commission later severed from these joint proceedings the issue of the proper method to be used in pricing natural gas produced by pipelines or their affiliates. 35 F.P.C. 497 (1966). The FPC's final decision in the severed proceeding (Opinion No. 568, Pipeline Production Area Rate Proceeding, 42 F.P.C. 738 (1969) was affirmed, with certain caveats, in City of Chicago, Illinois v. Federal Power Commission, 458 F.2d 731 (D.C.Cir. 1971).

5. In the Examiner's decision, the term "new gas" refers to gas produced under contracts executed after January 1, 1961. See 44 F.P.C. 761, 768, n. 3 (1970). The Commission's Opinion No. 586, however, refers to "new gas" as gas produced

Following the submission of briefs on exceptions, the Commission heard oral argument on October 31, 1969, in the Hugoton Anadarko proceeding as well as in the Texas Gulf Coast Area rate proceeding referred to above. On January 29, 1970, a new settlement proposal was filed by twenty-seven independent producers. This was done pursuant to sections 1.7 and 1.18 of the Commission's Rules of Practice and Procedure, 18 C.F.R. §§ 1.7 and 1.18. The Commission gave notice of this filing and advised the parties that comments or objections relating thereto might be filed with the Commission on or before March 2, 1970. A number of responses were received by the Commission concerning this new settlement proposal, including responses by petitioners and the consumer-intervenors before this court.[6]

On September 18, 1970, the Commission issued its Opinion No. 586, now under review. In this opinion the Commission adopted the second settlement proposal, announcing that it was doing so after considering the proposal upon its merits.[7]

We note the following points of comparison between the Examiner's initial decision and the settlement proposal approved by the Commission:

1. The proposal approved by the Commission generally permits higher maximum rates for the sale of gas than did the Examiner's decision.

2. The Examiner established one set of maximum rates for new gas from all fields in the Hugoton-Anadarko Area and for old gas from the so-called Other Fields, and a second set of rates for old gas from the Hugoton-Panhandle Field. By contrast, the Commission-approved proposal provides for three sets of base area rates, one for new gas from all fields in the area, a second for old gas from the Other Fields, and a third for old gas from the Hugoton-Panhandle Field.

3. As observed in footnote 5 herein, the Examiner had used January 1, 1961 as the date for distinguishing between new and old gas. The Commission, however, chose November 1, 1969 as its dividing date. Because new gas rates for the Hugoton-Panhandle Field, under both the Examiner's decision and the Commission order, are considerably higher than old gas rates for that field, the Commission's choice of the later date has the interesting effect of establishing *lower* rates than those set by the Examiner for Hugoton-Panhandle Field gas sold under contracts executed between 1961 and November 1, 1969.

4. The Examiner's decision had required all casinghead gas[8] from the

under contracts executed after November 1, 1969. *See* 44 F.P.C. 761, 786–787 (1970).

6. No consumer interests other than petitioners and the consumer-intervenors opposed the settlement proposal. Among consumer interests represented in the Commission proceeding who filed no opposition to the settlement proposal were: the Georgia Public Service Commission, Michigan Public Service Commission, Pennsylvania Public Utility Commission, Public Service Commission of Wisconsin, and the State Corporation Commission of Kansas.

7. Said the Commission, at 44 F.P.C. 772: "14. A settlement proposal by virtually all of the area's producers, supported by the pipelines and the distributors conveying the greater part of the interstate

gas from the area, commands attention. A resolution of the issues which so many parties are willing to accept reduces the possibility of future litigation. Of course the settlement proposal must be considered upon its merits, in the light of existing conditions, . . . . "

8. Casinghead gas is gas produced from oil wells in conjunction with the production of oil, while gas-well gas is not produced in association with oil. Certain other descriptive terms which will be employed in this opinion should also be briefly explained.

"Vintage" refers to natural gas by date of production, or by date of execution of the contract under which the gas is sold. The term is imprecise, and the dates of a given new, or old, vintage may vary from one rate order to the next, as they

Hugoton Panhandle Field, no matter what the vintage, to be sold at or below the maximum old gas rate for that field. The settlement proposal approved by the Commission, on the other hand, permits casinghead gas from the Hugoton-Panhandle Field to be sold at the higher old gas rate for the Other Fields. Further the Commission order provides for the possibility that "new" casinghead gas prices may in the future be raised to the same levels permitted for gas-well gas of comparable vintage.

5. The Commission-approved proposal permits, on or after July 1, 1972, an automatic one cent per Mcf increase in all basic area rates; following this increase, the Commission order imposes a five-year moratorium on further increases. The Examiner, by contrast, had permitted no automatic increases, but had prescribed only a two and one-half year moratorium, after which producers could file for further increases.

6. Both the initial decision and the settlement proposal permit additional charges for gas which can be delivered only after substantial off-lease gathering. For Other Field gas of all vintages, and for pre-1961 gas from the Hugoton-Panhandle Field, these "gathering charges" are almost identical as between the Examiner's decision and the Commission-approved proposal.[9] But for Hugoton-Panhandle Field gas in the 1961–1972 period, the proposal approved by the Commission permits gathering charges which are higher by nine-tenths of a cent to one cent per Mcf than the charges permitted by the Examiner; and the Commission-approved proposal permits a further one-half cent per Mcf

gathering charge for Hugoton-Panhandle Field gas after July 1, 1972.

7. The settlement proposal, as approved by the Commission, permits substantial relaxation of the quality standards for natural gas set by the Examiner's decision. Under the Commission order, most quality standards would be left open to negotiation by the contracting parties.

8. The Examiner's decision would have required producers to make full refunds of all amounts previously collected in excess of the rates determined to be just and reasonable by the decision. However, the Commission order approving the settlement proposal requires no refunds of excess amounts collected on sales made prior to 1961, requires refunds on seventy percent of such excess amounts for 1961 and 1962, and requires full refunds of such amounts on sales for 1963 and thereafter.

There are other points of difference between the initial decision and the Commission-approved settlement proposal, but they are minor in nature and have not been treated as significant by any of the parties in this court.

After the Commission had adopted the settlement proposal and denied petitions for rehearing, petitioners filed for review in this court.

Petitioners and the consumer-intervenors first argue that the Commission opinion and order under review must be set aside because: (1) there was no adversary hearing upon the settlement proposal, and (2) the nature of the Commission's consideration of the settlement proposal, as disclosed by Opinion No. 586, indicates that the Commission has failed to render a decision on the merits.

---

do between the Examiner's decision and the Commission order in this case. *See* footnote 5, *supra*, and accompanying text.

"Mcf" means one thousand cubic feet of natural gas at a prescribed temperature and pressure.

9. The permissible gathering charges for the described types of gas vary by no more than one tenth of a cent per Mcf between the initial decision and the proposal; and in some cases the initial decision permits the slightly higher rate, while in other instances the Commission-approved proposal permits the slightly higher charge.

We need not decide whether the settlement proposal, standing alone, and without further hearing, would provide an inadequate basis for a Commission order fixing natural gas production rates. The fact is that the settlement proposal did not stand alone. It was preceded by a vast evidentiary hearing, an extensive initial decision by the Presiding Examiner, elaborate briefs, and oral argument before the Commission. It was followed by written responses to the proposal, filed by all parties who desired to file responses, and by intensive study by the Commission's staff. Moreover, Opinion 586, adopting the settlement proposal in the course of fixing the rates in question, reveals that the Commission did not accept the settlement proposal carte blanche, but that the Commission articulated reasons, related to the record and other materials, which led the Commission to the result it reached.[10] It is in this setting that we must decide whether the Commission was required to provide a further adversary evidentiary hearing, before adopting the settlement proposal by its Opinion No. 586.

We start with the indisputable fact that the proposal came only from the industry and was not joined in by the consumer interests which were before the Commission. Moreover, the proposal was specifically opposed by certain consumer interests, including those before this court. Thus, when filed, the proposal represented only what the industry was willing to agree to without further agency or judicial contest.

Nevertheless, it was not without significance that the components of the natural gas industry, even though not truly competitive with each other, were able to accommodate their varying interests in the manner manifested by the proposal. Moreover, these proposals did not interject new factual issues. As we understand it, all of the features of the proposal were within the ambit of the positions taken in the agency hearings by one or more of the industry representatives. Thus, while the over-all proposal may have been new, there had been a full opportunity at the prior hearings to explore its individual facets.

■ Considered in this light we think the Commission was empowered to consider the settlement proposal on its merits without again opening the proceeding to adversary evidentiary hearings. Without necessarily subscribing to every statement made in Pennsylvania Gas and Water Company v. Federal Power Commission, 463 F.2d 1242 (D.C. Cir., 1972), we believe the documentation therein set forth, which need not be repeated here, amply supports our conclusion just stated.

■ To determine whether the Commission considered the settlement proposal on the merits, we look principally to the Commission opinion accepting that proposal reported at 44 F.P.C. 761 (1970). After devoting several paragraphs to the nature and history of the proceedings, the Commission opinion describes the settlement proposal and discusses specific objections thereto filed by consumer interests. Under the latter subject, the Commission opinion first deals with the general propriety of utilizing settlement proposals in formulating natural gas production rate orders.

The opinion then takes up such matters as the rate structure; the treatment of casinghead gas; the use of November 1, 1969, as the date of division between earlier and later vintages of gas; the wellhead prices of "Other Field" gas under contract before November 1, 1969; the wellhead prices for Hugoton-Panhandle Field gas; the proposed price escalation of July 1, 1972; the rate treatment of off-lease gathering; quality standards; minimum rates; the proposed moratorium on further rate increases; refunds; and supply and demand.

At 44 F.P.C. 772, the Commission, after observing that the settlement pro-

---

10. Whether the reasons given are adequate to support the result reached is another question to be explored at a later point in this opinion.

posal must be considered on its merits, in the light of existing conditions (*see* footnote 7, *supra*), added " . . . but this is quite different from California's insistence that we must ignore the settlement and take up the case on its merits as reflected in a voluminous record of raw evidence." Petitioners and the consumer-intervenors believe the quoted words indicate that the Commission did not consider the evidence in formulating its opinion. We do not agree. The Commission was merely drawing a distinction between considering the case on its merits in the light of the settlement proposal, and considering the case on its merits in disregard of that proposal.

At 44 F.P.C. 781, expressing approval of the settlement agreement, the Commission expressly stated that it had examined "each provision of the proposed settlement upon its merits." [11] The Commission also specifically found (at 44 F.P.C. 785) that the rates prescribed in the accompanying order are "just and reasonable rates." Further evidencing its consideration of the Examiner's initial decision and the exceptions which had been filed thereto, the Commission order contains a recital that, "[e]xcept as herein granted, the exceptions to the initial decision and proposed order are hereby denied." 44 F.P.C. 785.

█ Without, at this point in the opinion, expressing approval of the determinations made by the Commission in the course of its opinion, we think it evident that the Commission made a sincere effort to deal with the settlement proposal on the merits. Since it did so, we do not agree with the contention of petitioners and the consumer-intervenors that the Commission was without power to accept the settlement proposal over their objections. The proposal was not dealt with by the Commission as an agreed settlement by all of the parties (which of course it was not), but as a proposed resolution on the merits.

This was consistent with the powers conferred upon the Commission under section 5(b) of the Administrative Procedure Act, 5 U.S.C. § 554(c), and Commission procedures set forth in section 1.18(a) of its Rules of Practice and Procedure, 18 C.F.R. § 1.18(a). *See also* Michigan Consolidated Gas Co. v. Federal Power Commission, 108 U.S.App.D.C. 409, 283 F.2d 204, 224–226 (1960). This was also consonant with the view expressed in Permian Basin Area Rate Cases, 390 U.S. 747, 767, 88 S.Ct. 1344, 1360, 20 L.Ed.2d 312 (1968), that the Commission must be:

> " . . . free, within the limitations imposed by pertinent constitutional and statutory commands, to devise methods of regulation capable of equitably reconciling diverse and conflicting interests."

What has been said above also distinguishes this case from Minneapolis Gas Co. v. Federal Power Commission, 111 U.S.App.D.C. 16, 294 F.2d 212 (1961), relied upon by petitioners on this branch of the case. In the *Minneapolis Gas* case the court held that, once the Commission had instituted a hearing on a suspended rate increase, a record had been compiled and an Examiner's decision rendered, it could not simply terminate the proceeding and authorize the increased rate without first rendering a decision as to whether the rate involved was lawful. In our case, on the other hand, the Commission rendered a decision, based on findings which it believed were supported by substantial evidence, prescribing lawful rates.

11. At 44 F.P.C. 781, the Commission further stated:
" . . . we find that the proposal as a whole is in the public interest, and should be made the order of this Commission. It is fair to the consuming public, and will promote certainty and stability and reduce administrative burdens by reduc-

tion of contested issues. Adoption of the proposal will contribute to obtaining additional supplies of gas from this crucial area, and contribute to cooperation in the attempt to deal with the problems of gas supply. For all these reasons, the settlement proposal should be adopted."

Petitioners and the consumer-intervenors urge that the order under review must be set aside because the Commission failed to make a finding as to the overall rate of return.

With regard to rate of return the Commission stated, at 44 F.P.C. 775:

"Changes in the economic climate—evidenced, for example, by persistent inflationary trends in the general economy and unusual liquidity pressures on corporate enterprises—have made it apparent that the 12 percent rate of return found adequate by the Commission in 1965 (*Permian*) and 1968 (*Southern Louisiana*) should be adjusted upward."

The Commission's opinion and order increased the prices permitted for gas produced under contracts executed on or after November 1, 1969, by amounts ranging from two and seven-tenths to six and nine-tenths cents per Mcf above the prices proposed by the Examiner, not including the one cent per Mcf escalation to become effective on July 1, 1972. It is obvious that these rate advances will increase the prospective rate of return the producers will earn. However, the Commission did not, in its opinion, indicate what the rate of return would be under the new rates.[12]

Petitioners argue that a knowledge of the appropriate rate of return to be allowed is crucial on review, because without such knowledge it is virtually impossible to decide whether a rate or charge is excessive, unjust or unreasonable. Petitioners also point out that the rate of return has been a principal issue in prior area rate cases such as Southern

Louisiana Area Rate Cases v. Federal Power Commission, 428 F.2d 407 (5th Cir. 1970).

The fact that this case involves area rate regulation, rather than rate regulation of individual producers, does not excuse the Commission from the duty of finding that specific rate levels are or are not just and reasonable within the meaning of sections 4(a) and 5(a) of the Act. Permian Basin Area Rate Cases, 390 U.S. 747, 826–827, 88 S. Ct. 1344, 20 L.Ed.2d 312 (1968). But the area aspect of the case does considerably lessen the importance of determining the projected rate of return under particular rate levels, in the course of determining whether such rate levels are just and reasonable.

The appearance of precision and objectivity which a rate of return determination lends to an agency decision fixing rates for a particular utility becomes somewhat illustory where the decision is one fixing area rates. In an area case the rate base is the aggregate of the rate bases of all of the individual producers. This is also true of other factors to be considered in fixing a rate of return, such as costs and revenue. It would be purely coincidental if the rate base, costs and revenue of a particular producer within the area were relatively the same as established for the area in the aggregate. Thus a rate of return premised upon the aggregate of these factors for producers in an entire area may substantially overstate or understate the rate of return a particular producer in the area will realize from the projected rate level.[13]

12. We note, however, that in the brief filed by Shell Oil Company and a group of producer-intervenors, it is calculated that the Commission's prescribed rate for gas-well rates contracted prior to November 1, 1969, would produce a rate of return of not more than fifteen percent. A fifteen percent rate of return was found to be appropriate by the Commission in *Texas Gulf Coast* (Opinion No. 595) . . . F.P.C. . . . (May 6, 1971), and in *Southern Louisiana II* (Opinion No. 598) . . . F.P.C. . . . (July 16, 1971). In the case before us, the major

producer group presented extensive evidence tending to justify a rate of return of sixteen to eighteen percent.

13. In addition, of course, a rate of return determination in an area case is affected by all of the imponderables which must be taken into account in determining a rate of return for a particular producer. As the Commission states in its brief: "There are a variety of choices available to the Commission in examining rate of return: Whether to use earnings data from integrated or noninte-

These considerations indicate to us that while rate of return is a consideration which may appropriately be taken into account in an area rate case, it is not necessarily an indispensable or controlling factor. If, in a particular area case, the Commission reasonably determines that other appropriate factors require the area rate to be at a particular level, the absence of a specific finding as to the average rate of return this rate level would achieve in the aggregate, is not fatal to the agency decision.

■ Moreover, in the case before us, the Commission did not completely disregard the factor of rate of return. Instead, it started with the premise that the level of rates proposed in the initial decision would, as the Examiner found, produce an average rate of return of twelve percent.[14] The Commission found that a twelve percent rate of return was no longer adequate, stating its reasons for so concluding.[15]

■ In light of the record evidence supporting a higher rate of return, we cannot say that the Commission erred in its conclusion. More important, in view of the considerations referred to in note 15 herein, and elsewhere in this opinion, we conclude that the justness and reasonableness of the rates prescribed by the Commission does not depend upon the average rate of return they may produce. It follows that the Commission did not err in failing to state an average rate of return.

grated firms? What time period should be used in judging prior earnings performance? Whether to use earnings data from a firm's production department? What weight should be given the 'discounted cash flow' method or the 'true yield' theory? Moreover, assuming a precise rate of return figure has been obtained, there remains the question of the appropriate theoretical average rate base to which such a rate is to be applied. Such a rate base for producers is composed of three cost components: successful well costs, lease acquisition costs, and other production facilities. Each of these components of the rate base is itself a variable cost component. Finally, assuming some precise rate base may be arrived at, one must determine both the depletion standard and time lag in order to calculate the average net investment."

14. In his decision, the Examiner found that a ten and one-half percent over-all rate of return should be adopted. The Examiner concluded that this over-all rate would permit a return on equity in excess of twelve percent.

15. In determining that a twelve percent rate of return would be adequate, the Examiner had adhered to the "comparable earnings" test set forth in Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 603, 64 S.Ct. 281, 88 L.Ed. 333 (1944). We do not believe the Hope decision stands for the rule that a "comparable earnings" test is required. In the Permian case, the Supreme Court specifically held that "other standards might properly have been employed."

390 U.S. at 806, 88 S.Ct. at 1380. See Southern Louisiana Area Rate Cases v. Federal Power Commission, 428 F.2d 407, 424, n. 38 (5th Cir. 1970).

The agency record indicates that, as applied by the Examiner in this case, the "comparable earnings" test yielded uncertain results. Staff witness Shaffner indicated that the period used in his rate of return recommendation, 1959–1963, was the lowest five-year earnings period since World War II. Other witnesses, likewise relying on historical earnings, arrived at different results. Witness Morton, using data from the 1952–1965 and 1961–1965 periods, recommended a sixteen percent rate of return. The record contains several other studies of rate of return based upon the earnings of production departments of integrated companies, showing rates of return ranging from fourteen and nine-tenths percent to fifteen and nine-tenths percent.

It was in the light of this wide range of evidence on rate of return, and other factors mentioned in the Commission's opinion, that a twelve percent rate of return was held to be inadequate. The Commission here referred to changes in the economic climate, evidenced by persistent inflationary trends in the general economy, "unusual liquidity pressures" on corporate enterprises, and rising interest rates. While the Commission made these observations in connection with its discussion of the one cent per Mcf price escalation which would go into effect on July 1, 1972, the same reasons are applicable with regard to the over-all problem of rate of return.

Petitioners cite State Corporation Commission of Kansas v. Federal Power Commission, 206 F.2d 690, 718–723 (8th Cir. 1953); and Mississippi River Fuel Corp. v. Federal Power Commission, 82 U.S.App.D.C. 208, 163 F.2d 433 (1947), for the proposition that without knowledge of the appropriate rate of return to be allowed "it is virtually impossible to decide whether a rate or charge is excessive, unjust, or unreasonable."

Both of these cases involved the determination of rates for the sale of natural gas at wholesale by individual natural gas pipeline companies. The rates prescribed by the Commission were predicated upon the Commission's view as to an appropriate rate of return. It necessarily followed that the validity of the Commission's rate orders was tested, in the courts, with reference to the rate of return factor. But we find nothing in those decisions which purports to announce a general principle, applicable to area-wide rate cases such as this, that the determination of a precise rate of return is crucial in fixing the area rate level.

In Federal Power Commission v. Hope Natural Gas Company, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944), the Supreme Court took occasion to emphasize that, in the Natural Gas Act, Congress did not specify any particular formula to be applied in fixing rates.[16]

Established precedent requires only that the total impact of the Commission's order be just and reasonable. As the Supreme Court said, in *Permian, supra*:

"[W]e have heretofore emphasized that Congress has entrusted the regulation of the natural gas industry to the informed judgment of the Commission, and not to the preferences of reviewing courts. A presumption of validity therefore attaches to each exercise of the Commission's expertise, and those who would overturn the Commission's judgment undertake 'the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences.' FPC v. Hope Natural Gas Co., supra, [320 U.S., at 602, 64 S.Ct., at 288.]" 390 U.S. at 767, 88 S.Ct. at 1360.

■ An argument related to this rate-of-return contention is the consumer-intervenors' contention that the Commission erred in abandoning cost-based principles for determining just and reasonable rates.

In both the *Permian* case and the *Southern Louisiana Area Rate Cases*, 428 F.2d 407 (5th Cir. 1970), as the consumer-intervenors point out, a cost-based area approach was utilized. But it would be a mistake to assume that general costing techniques were all that was considered in those cases. In *Permian*, for example, the Supreme Court pointed out four specific instances where the Commission had employed non-cost factors.[17] In connection with

---

16. In *Hope*, the Court said:

"Congress, however, has provided no formula by which the 'just and reasonable' rate is to be determined. It has not filled in the details of the general prescription of § 4(a) and § 5(a). It has not expressed in a specific rule the fixed principle of 'just and reasonable.'" (footnote omitted) 320 U.S., at 600–601, 64 S.Ct. at 287.

"We held in Federal Power Commission v. Natural Gas Pipeline Co., *supra* [315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037 (1942)] that the Commission was not bound to the use of any single formula or combination of formulae in determining rates. Its rate-making function, more-

over, involves the making of 'pragmatic adjustments.' Id., [315 U.S.] p. 586 [62 S.Ct. at page 743, 86 L.Ed. 1037]." 320 U.S. at 602, 64 S.Ct. at 287.

17. The Court there said:

"98. We understand the principal points at which the Commission employed noncost factors to be four. It used the logic of functional pricing to justify both its two-price rate structure and its selections of sources of cost data. Second, it explained its imposition of a single maximum rate upon all old gas by, among other reasons, the importance of a relatively uncomplicated rate structure. Third, the Commission justified its adop-

the use of such non-cost factors, the Court said:.

"Cost and noncost factors do not, as the Court of Appeals supposed, race one against the other; they must be, as they are here, harnessed side by side. The Commission's responsibilities necessarily oblige it to give continuing attention to values that may be reflected only imperfectly by producers' costs; a regulatory method that excluded as immaterial all but current or projected costs could not properly serve the consumer interests placed under the Commission's protection." 390 U.S. at 815, 88 S.Ct. at 1385.

In the case before us, the Examiner made detailed findings for both the nation-wide cost of new gas and the historical cost of Other Field gas in the Hugoton-Anadarko Area. The Examiner based his suggested rate levels primarily upon these cost computations. The Commission held that the Commission's higher level for such gas, ranging from one and two-tenths cents per Mcf to one and one-half cents per Mcf for wellhead prices of Other Field gas under contract before November 1, 1969 (old gas) as set out in the proposed settlement, lies well within the zone of reasonableness indicated by the Examiner's cost computations, when two additional circum-

stances are considered. One of these circumstances, said the Commission, is that all cost computations are necessarily imprecise.[18] The other is that circumstances which obtain in the present case accentuate such inaccuracies.[19]

The consumer-intervenors contend that these reasons given by the Commission are insufficient and that, to justify such an increase, it was incumbent upon the Commission to make new cost findings based upon the record. However, considering the nature of the Commission's reason for not strictly applying the Examiner's cost computations, we think the Commission said about all that could usefully be said with regard to costs. The Commission could not have been more specific inasmuch as its reasons for denying full credence to the Examiner's cost computations were that both inherently, and with regard to this particular case, cost computations are not reliable.

The Commission's conclusion that the rate level for wellhead prices of old Other Field gas, as stated in the proposed settlement, lies within the zone of reasonableness indicated by the Examiner's cost computations, as discounted by the Commission, involves a judgment determination concerning which the Commission has special competence. We are not

tion of a temporary period of price restriction by the exigencies of area regulation. Fourth, the Commission based its calculation of the rate of return upon the risk factors that it did not directly reduce to cost components." 390 U.S. at 815, n. 98, 88 S.Ct. at 1384.

18. In the *Southern Louisiana Area Rate Cases, supra,* the court also referred to the "inaccuracy of pricing techniques." 428 F.2d, at 423, note 33.

19. The Commission explained:
"This [the accentuation of inaccuracies] is because this historic area cost data is not broken down between the gas produced from the Hugoton-Panhandle field and gas produced from the Other Fields. In the initial decision it was necessary to divide these costs between Hugoton-Panhandle and the Other Fields. This was done by selecting two

sub-areas as representative of Hugoton-Panhandle Field gas cost and from this calculating the cost of Other Field gas. A careful examination of all available evidence leads us to the conclusion that there is no sub-area which can be selected as fairly representative of either Hugoton-Panhandle Field costs or Other Field costs. No participant has suggested, and this Commission has been unable to devise, any better method than the use of a representative sample to allocate costs between the Hugoton-Panhandle and the Other Fields. It is apparent, however, that the use of the sub-area selected in the initial decision as representative of Hugoton-Panhandle Field costs resulted in the allocation of too great a part of the cost to the Hugoton-Panhandle Field gas and too little to the Other Field gas." 44 F.P. C. at 773–774.

disposed to supplant the Commission's judgment with our own.[20]

In addition to the increased rate level prescribed by the Commission, as discussed immediately above, the Commission established a new vintage of well-head Other Field gas, to include all such gas produced under contracts beginning November 1, 1969, labeled "new" gas. See note 5 herein. For such gas the settlement proposal provided for an additional one and one-half cents per Mcf. In explaining why it approved this increased rate level on new gas, the Commission pointed out that the computation in the initial decision of the historic cost of Other Field gas was based largely upon 1962 data. By November, 1969, the Commission noted, this data was nearly seven years old. The Commission then stated, at 44 F.P.C. 774:

"If 1969 or 1970 data were collected there is every reason to believe it would show the historic area cost at that time to be well in excess of the historic area cost in 1962. The trend of national cost computations is also upward. We find that cost factors alone would justify the higher price for this later vintage gas."

The Commission went on to say, however, that it did not reach this determination upon a consideration of costs alone. The proposed later vintage prices, the Commission stated, were approved also "as a means of encouraging exploration for and development of additional supplies of gas." [21] *Id.*

Petitioners object, on two grounds, to the Commission determination that new gas should be at one and one-half cents per Mcf higher rate level than old gas. One of these grounds is that there is no finding as to an over-all rate of return supporting such a determination. We have sufficiently discussed rate-of-return problems earlier in this opinion.

Petitioner's second ground for objection to this determination is that the Commission provides no explanation, but states only, "On the merits, we approve these principles." The quoted words appear at 44 F.P.C. 772, where the Commission merely summarizes the rate

---

20. In *Permian*, the Supreme Court said:
"[T]his Court has often acknowledged that the Commission is not required by the Constitution or the Natural Gas Act to adopt as just and reasonable any particular rate level; rather, courts are without authority to set aside any rate selected by the Commission which is within a 'zone of reasonableness.' FPC v. Natural Gas Pipeline Co., 315 U.S. 575, 585 [62 S.Ct. 736, 743, 86 L.Ed. 1037]. No other rule would be consonant with the broad responsibilities given to the Commission by Congress; it must be free, within the limitations imposed by pertinent constitutional and statutory commands, to devise methods of regulation capable of equitably reconciling diverse and conflicting interests." 390 U.S. at 767, 88 S.Ct. at 1360.

21. The Commission went on to explain, at 44 F.P.C. 774–775:
"25. The central location of this area makes the discovery and development of its gas particularly desirable. Many of the largest pipelines are largely dependent upon the Hugoton-Anadarko area for major portions of their gas supplies. Gas which is made available in this area can be delivered to major markets with a minimum of delay. To major midwest cities it is vital, and to other widely divergent parts of the country it is scarcely less important. The prices proposed may not solve the gas supply problem, but it is reasonable to expect that prices proposed by the industry itself will assist in moderating supply difficulties. The rate stability here provided will be beneficial to all segments of the industry and to consumers as well."

The Commission also discussed the supply and demand problem at length at 44 F.P.C. 781–783. The Commission concluded that while all major sources of energy in the United States, including gas, are currently in short supply, there is a continuing growth in demand for gas which has risen beyond all expectations of a few years ago. The Commission noted that there is no direct evidence in this proceeding as to what relationship a particular price might have to new gas supplies. But it added, at 44 F.P.C. 783:
"Since price is one of the important factors bearing on supply, it is reasonable, therefore, to anticipate greater supplies of gas from an increased level of rates."

structure approved by the opinion. The Commission's full explanation for this determination appears at 44 F.P.C. 774–775, and has been summarized above.

The consumer-intervenors argue that the Commission's add-on of an additional one and one-half cents per thousand cubic feet based on a new vintage for all gas contracts after November 1, 1969, is completely unsupported by any cost evidence in the record. These intervenors point out that the 1969 or 1970 data referred to by the Commission is not in the record. Then, going outside of the record themselves, they assert that, in the latest hearings in the *Southern Louisiana Area Rate Case*, AR69–1, cost data submitted by the producers themselves for a 1969 test year demonstrates lower costs in that area below those incurred by the companies in the 1960 test year originally used by the Commission.

■ Having in view the Commission's general expertise and its access to continuing studies, we think it was entitled to render an informed judgment, when it issued its decision on September 18, 1970, as to what 1969 and 1970 data would have shown as to increased costs.[22] While this involved the taking of official notice of economic trends, we think this not inappropriate. Even this court is entitled to take judicial notice of facts coming to light after the close of the hearing. In *Permian*, the Supreme Court indicated a similar view, stating: "We are entitled now to take notice that these [estimates] are confirmed by subsequent events." 390 U.S. at 812, 88 S.Ct. at 1383.

■ This is not to say that, if subsequent developments disproved the Commission's projection of costs, this would establish the invalidity of the order. If the Commission's determination was reasoned and reasonable when made it is not rendered less so by subsequent events. Thus we are not persuaded that the consumer-intervenors' reference to data submitted in another case for a 1969 test year calls for reversal of the opinion under review.

As noted above, the Commission did not base its determination that new gas should sell at a higher price upon costs alone, but also as a means of encouraging exploration for and development of additional supplies of gas. The consumer-intervenors challenge the soundness of this ground for increasing the rate level proposed by the Examiner. They argue that the asserted supply and demand conclusions of the Commission are not established in the record, and that, applying the test utilized in City of Detroit, Mich. v. Federal Power Commission, 97 U.S.App.D.C. 260, 230 F.2d 810, 817–818 (1955), such conclusions do not justify the increased rates in question.

With regard to the sufficiency of the evidence, the consumer-intervenors first assert that the Commission's finding of a gas shortage is based upon three sources: (a) the 1969 American Gas Association (AGA) Report; (b) the 1969 FPC "Staff Report on National Gas Supply and Demand"; and (c) the 1969 Future Requirements Committee Report. These intervenors then argue that the 1969 AGA Report is unreliable because it is based upon industry-oriented statistics taken from data concerning uncommitted reserves which the industry has always maintained are confidential. Since the 1969 FPC Staff Report

22. In this connection the Commission points out in its brief in this court that whereas the 1963 Census of Mineral Industries showed gas well drilling costs were sixteen dollars and forty-eight cents per foot and dry-hole drilling costs were eight dollars and sixty-nine cents per foot, the 1967 Census of Mineral Industries indicates gas well drilling costs of twenty-five dollars and eighty-two cents per foot and dry-hole-drilling costs of fourteen dollars and ninety-seven cents. The Commission adds:

"[I]f one were to use the same productivity figure of 595 mcf, as was used by the Examiner in computing successful well costs, but substituting 1967 drilling costs for 1963 data, the costs of this one component would increase from 2.77 cents per mcf to 4.32 cents per mcf." (Footnotes omitted.)

makes use of this same industry data, the consumers contend that it, too, is deficient.[23]

On April 29, 1965, the Examiner set forth a list of recognized, published industrial statistical sources which would be used by the parties in the proceedings.[24] These sources included American Gas Association Annual Reports. The Examiner indicated, however, that his action in recognizing the published sources "does not foreclose cross-examination directed to the weight, if any, to be given to any particular source. Later, in his decision, the Examiner noted that the parties "were given the opportunity to show, among other things, whether such data was unrepresentative or otherwise unreliable for use in connection with the determination of the various cost components."

█ Thus if there was anything intrinsically unreliable about the AGA Annual Reports, the consumer-intervenors had an ample opportunity to inquire into the matter. Yet neither the consumer-intervenors nor any other party made any showing of unreliability. On the contrary, a large group of distribution companies presented a witness, Dr. Bruce C. Netschert, who was both a geologist and an economist, who discussed these matters. This witness stated categorically that he did not question that the AGA data are in fact anything other than what they purport to be. Under these circumstances we think the consumer-intervenors are not now in a position to question the reliability of the reports.[25]

Apart from the reports which the consumer-intervenors question, there was additional record evidence tending to support the Commission's conclusions with regard to gas supply. This evidence pertained to the decline in reserves-to-production ratios in prior years, trends in findings-to-production ratios, and demand projections for gas.

The Commission also recognized that distributors in a number of areas have imposed restrictions upon gas use (44 F.P.C. at 781), and that pipelines are unable to obtain desired supplies of natural gas (*Id.*).[26] The distributor witness referred to above testified that the principal indicator of a gas deliverability

23. The consumer-intervenors additionally contend that the 1969 Future Requirements Committee (FRC) Report "has similarly not been tested and even its projections the Commission discounted." No record reference is supplied concerning this asserted Commission action.

24. The AGA Reports, referred to by the consumer-intervenors, have been published annually since 1945. These reports, we are told, are relied upon by financial institutions and the industry. They have also been relied upon by the Commission in prior rate proceedings. Permian Basin Area Rate Proceeding, 34 F.P.C. 159, at 197 (1965); Southern Louisiana Area Rate Proceeding, 40 F.P.C. 530, at 545 (1968). *See also*, Permian Basin Area Rate Cases, *supra*, 390 U.S. at 816–817, 88 S.Ct. 1344, 20 L.Ed.2d 312. The Fifth Circuit commented extensively on the FPC Staff Report in question, indicating that "there is evidence of a serious supply deficiency." Southern Louisiana Area Rate Cases, *supra*, 428 F.2d at 415, 437, 438 and 440.

25. We also note that the consumer-intervenors did not participate to any extent in the agency hearings in this case, nor did they file exceptions or answers to exceptions. They challenged a subsequent AGA report for the first time in their application for rehearing of October 19, 1970, almost four years after the record had been closed. These additional circumstances make it questionable whether these intervenors have standing to raise this question. See 18 C.F.R. § 1.31(c); Wisconsin v. Federal Power Commission, 91 U.S.App.D.C. 307, 201 F. 2d 183, 186–187 (1952).

26. The Commission has found it necessary to authorize new and simpler procedures for authorization of emergency purchases of gas by pipelines. *See* FPC Orders Nos. 402, 43 F.P.C. 707 (1970), 402–A, 43 F.P.C. 822 (1970), and 418, 44 F.P.C. 1574 (1970). Curtailment proceedings by pipelines include Natural Gas Pipeline Company of America, Docket No. RP 70–42, Northern Natural Gas Company, Docket No. RP 71–89, and United Gas Pipe Line Company, Docket No. RP–71–29.

crisis would be the "persistent and widespread inability of the pipelines to obtain new reserves when they wanted them." (R. 8169). The Commission could take official notice of the fact that such inability had come to pass, and to conclude therefrom that there is a gas shortage in this nation.

The *City of Detroit* case, *supra,* cited by the consumer-intervenors for the proposition that the Commission's supply and demand conclusions do not justify the rate increase partially based thereon, does not persuade us that the same point of view is applicable here. That case involved a single pipeline company cost-of-service problem. The application of that decision to a review, as in the case before us, of a producer-area rate opinion and order is questionable to say the least. In Wisconsin v. Federal Power Commission, 373 U.S. 294, 310, n. 16, 83 S.Ct. 1266, 1275, 10 L.Ed.2d 357 (1963), the Supreme Court had this to say about the court's view, in *City of Detroit*, that cost of service must be used "at least as a point of departure" :

> "Whatever the court may have meant in that context, it is clear that it did not have before it any question relating to the area rate method, . . ."

The action of the Commission in taking account of demand and supply problems in fixing area rate levels is consistent with the view expressed by the Supreme Court in *Permian*.[27] Likewise, the Commission's action here has precedent in *Southern Louisiana Area Rate Cases, supra,* 428 F.2d at 426, where the court said:

> "We think that the need for dramatically increased production from Southern Louisiana justifies the noncost factors added here, and that the FPC has power to include noncost elements

that reflect its assessment of the need to use price as a tool to influence such economic relations. These are propositions that apply generally to regulation of utilities and quasi-utilities."

There remains for consideration, on this branch of the case, the Commission's approval of the escalation feature of the proposed settlement, under which all area rates may be increased by one cent per Mcf on July 1, 1972.[28]

The Commission gave two reasons for approving this escalation provision. The first of these is that such an increase is warranted because changes in the economic climate, as evidenced by persistent inflationary trends in the general economy, unusual "liquidity" pressures on corporate enterprises, and increased prime and bond interest rates, make it apparent that the twelve percent rate of return found adequate by the Commission in 1965 (*Permian*) and 1968 (*Southern Louisiana*) should be adjusted upward. The second reason, limited to rates for new gas, is that the proposed escalation is necessary and proper to provide additional incentives "to find and commit to interstate commerce the particularly valuable gas from this vital supply area." 44 F.P.C. at 776.

All that petitioners have to say about this feature of the Commission opinion and order is that it is unsupportable because there are no adequate findings relating to rate of return. We have expressed above our reasons for rejecting this contention. The consumer-intervenors make the same argument, but they also question what the opinion has to say about increases in prime interest rates since 1968. The Commission opinion states that, compared with prime rates of six percent to six and three-fourths percent charged by commercial

**27.** In *Permian*, the Supreme Court, referring to the "zone of reasonableness," said : "The Commission may, within this zone, employ price functionally in order to achieve relevant regulatory purposes ; it may, in particular, take fully into account the probable consequences of a given price level for future programs of

exploration and production." 390 U.S. at 797, 88 S.Ct. at 1376.

**28.** In this connection it is to be noted that the Commission opinion and order under review prescribed a moratorium on rate increases after this one cent per Mcf escalation, until July 1, 1977.

banks during 1968, the prime rate was raised to eight and one-half percent in June, 1969, and has been at eight percent since March 1970. The consumer-intervenors state that this Commission's statements concerning increases in prime interest rates are not only extra-record, "but are no longer valid."

■■ We assume that the data relied upon by the Commission in estimating increases in prime interest rates are not in the record. In the absence of any reason suggested by the consumer-intervenors why the Commission should not do so, we think the Commission could appropriately take official notice of these increases. The consumer-intervenors provide no support for their contention that the Commission's statements concerning increases in prime interest rates "are no longer valid." But assuming that prime rates have turned downward since issuance of the Commission's opinion and order, we do not think this is a sound reason for overturning the Commission opinion and order.

The settlement proposal approved by the Commission excuses one hundred percent of the refunds of amounts collected in excess of the settlement rates applicable to sales made through December 31, 1960, and thirty percent of amounts collected in excess of the settlement rates applicable to sales made during 1961 and 1962. For excess amounts collected on sales on and after January 1, 1963, full refunds are required.[29]

Both the petitioners and consumer-intervenors contend that the Commission exceeded its authority and abused its discretion in permitting the forgiveness of refunds as indicated above.

The Commission discussed the matter of refunds at 44 F.P.C. 779–780. The Commission stated that, to the extent refunds were excused, this reflects "the peculiar situation of Phillips Petroleum Company."

From the Commission's discussion it appears that Phillips Petroleum Company (Phillips), unlike other major producers, was unwilling to enter into a company-wide settlement with the Commission during the early 1960's. Under such settlements, refunds due from other companies were forgiven approximately as set forth in the proposed settlement now under review. The reason Phillips would not enter into a settlement at that earlier time was that, until the instant decision, it had not been established that Phillips, which had extensive gathering facilities, could obtain an additional rate allowance for gathering, because gathering allowances were not included in the Commission's Statement of General Policy No. 61–1, 24 F.P.C. 818 (1960), under which settlements were being obtained. The major share of potential refunds during the years 1960 and 1963, approximating eighty percent of the total, are the responsibility of Phillips.

■ In light of the Commission's explanation, the petitioners' contention that the forgiveness of refunds discriminates in favor of Phillips and, in effect, establishes contract rates as the just and reasonable rates for sales prior to December 31, 1960, is not persuasive. The contract rates were, it is true, permitted to prevail through December 31, 1960, but this was done to avoid a result which would have treated Phillips unfairly as compared to the other producers.

■ As the Commission points out, section 4(e) of the Act, 15 U.S.C. § 717c(e), does not require refunds where unlawful rates have been collected in prior years, but leaves this to the discretion of the Commission.[30] The view

---

29. The total refunds required for the period ending December 31, 1969, would be approximately forty-seven million dollars. The excess amounts collected, and not required to be refunded, would total about five million dollars.

30. Section 4(e) provides in part:
"... the Commission *may*, by order, require the natural gas company ... to refund any amounts ordered by the Commission, ..." (Emphasis added.)

that the Commission's refund power is discretionary has support in the court decisions.[31] In *Permian,* 390 U.S., at 767, 88 S.Ct. 1344, 20 L.Ed.2d 312, the Supreme Court made it clear that the Commission is free, within the limits imposed by pertinent constitutional and statutory commands, to devise methods of regulation capable of equitably reconciling diverse and conflicting interests. In exercising this discretion it is "the duty of the Commission to look at 'the backdrop of the practical consequences . . .' " of its refund order. Federal Power Commission v. Tennessee Gas Transmission Co., 371 U.S. 145, 155, 83 S.Ct. 211, 216, 9 L.Ed.2d 199 (1962).

This is what the Commission did in the case before us with regard to refunds. We find no abuse of discretion in this respect.

Affirmed.

31. *See* Mesa Petroleum Co. v. Federal Power Commission, 441 F.2d 182 (5th Cir. 1971) ; Niagara Mohawk Power Corp. v. Federal Power Commission, 129 U.S.App.D.C. 376, 379 F.2d 153, 157–158 (1967) ; Continental Oil Co. v. Federal Power Commission, 378 F.2d 510, 532 (5th Cir. 1967) ; Public Service Commission of New York v. Federal Power Commission, 117 U.S.App.D.C. 287, 329 F.2d 242, 250 (1964).